# MARY KUHLMAN v. WATER, LIGHT & TRANSIT COMPANY, Appellant.

### Division One, April 13, 1925.

1. **APPELLATE PRACTICE: Demurrer to Evidence.** In determining whether plaintiff failed to make a case for the jury, where a verdict in the action at law was returned in her favor, it is the duty of this court, as it was the duty of the trial court, when it passed upon the defendant's requested peremptory instruction, to consider as true the testimony of her witnesses, and to allow in her behalf every reasonable inference the jury might draw from the facts and circumstances of the case.

2. **EVIDENCE: Ownership of Electric Plant: Acts of Control and Management.** Where plaintiff charges that the burns on her hands and body were caused by defendant's defective wires and appliances with which her premises and an electric iron were connected, defendant's ownership of the transmission system may be inferentially proved. Testimony that a certain man was manager in defendant's office in a near-by town; that plaintiff made arrangements with him to extend the light wires, previously installed by another company, from her residence to her garage and chicken house; that those wires and appliances were installed, and a bill for the cost on defendant's stationery was mailed to her, and by her paid at said office, and a receipt therefor received; that a day or two before her injury she telephoned to said manager to send men to her house, and in response two workmen came on the afternoon of the injury and undertook to adjust or correct the defective electrical appliances in the residence and chicken house, is evidence sufficient to establish defendant's ownership and operation of the electrical transmission system.

3. **ELECTRIC WIRES: Duty to Inspect.** An electric service company which has undertaken to make repairs, as distinguished from the original installation, and inspection of the equipment and appliances on the premises of a customer, must use care commensurate with the duty and obligation it has voluntarily assumed, and failure upon its part to use such care and to inspect and repair the appliances to the extent of making them safe for use renders it liable to the customer for ensuing injury and damage.

4. ———: **Injury by Use of Electric Iron: Causal Connection: Demurrer to Evidence.** The evidence strongly indicates that plaintiff, instead of being burned, as she alleges, by defective electric wires con-

nected with an electric iron she was using in her house, was injured by grasping in her hand a dangling ground wire outside the house; but as she positively, though she alone, testified that she was burned when she took hold of the electric iron before she went outside to take away from the house hot poultry wires which had come in contact with the dangling wire, and it cannot be said that it was impossible that she may have been burned on the electric iron, it cannot be ruled that no causal connection between the allegation and her injury was established by the evidence, or that a demurrer to her case should have been sustained.

5. INSTRUCTION: Broader than Pleading: Installation of Electric Wires. An instruction cannot be broader than the pleadings, and if such an instruction is given the error is presumed to be harmful. Where the petition did not charge any act of negligence in the installation of electric wires on plaintiff's premises, an instruction hypothesizing plaintiff's right to recover upon "the negligent, careless and unskillful installation of wires and equipment on said premises" is error.

6. ———: Broader than Evidence: High Tension Electric Current. An instruction should not authorize a finding which is not supported by any evidence. An instruction authorizing a verdict for plaintiff if the jury find that defendant "knowingly permitted and allowed high tension electric current to pass over and through the wires, equipment and appliances installed in plaintiff's premises when the same were in defective condition," is erroneous where there is no evidence showing what voltage or amperage of electric current was passing through the wires into plaintiff's home at the time of her injury, none showing what voltage or amperage constitutes a "high tension electric current," none that plaintiff would not have been burned had a less voltage or amperage been passing through the wires, and the expert witnesses offered by both sides agreed that if the electrical current exceeded twenty-five amperes or 125 volts the normal result would have been to "blow" the fuses—a breaking of the circuit and a stopping of the current.

7. ———: Contradictory: High Tension Electric Current. Contradictory instructions are confusing and mislead the jury. An instruction authorizing a verdict for plaintiff if defendant "permitted high tension electric current to pass over and through the wires," and an instruction for defendant that "under the evidence the jury cannot find against defendant on account of the alleged charge that defendant permitted an excessive voltage of electricity to pass into plaintiff's residence," are contradictory; and both having been given and the verdict being for plaintiff, and there being no

evidence that a high tension electric current passed over the wires into plaintiff's residence, the error was not harmless.

8. ————: ————: ————: **Res Ipsa Loquitur.** The rule of *res ipsa loquitur* does not apply to a petition alleging specific acts of negligence. If specific negligent acts are alleged they must be proved, and there is no room for a reliance upon presumptive negligence. Where plaintiff alleged that defendant "negligently permitted and caused electric current in dangerous amount to pass over the wires and through the equipment into plaintiff's home" the burden is upon plaintiff to prove the allegation, and not on defendant to prove that an excessive and dangerous amount of electricity did not pass over the wires; and therefore it cannot be held that an instruction for defendant telling the jury that there was no evidence of an excessive current, should not have been given—there being no evidence to prove the allegation.

9. ————: **High Degree of Skill: No Proof.** The fact that plaintiff was injured does not prove that defendant's workmen did not possess a high degree of skill. An instruction authorizing a verdict for plaintiff if defendant negligently and carelessly, in response to her request, sent employees to inspect the wires and electric appliances on her premises, "not possessing a high degree of skill," should not be given, where there is no evidence that the inspectors did not possess a high degree of skill. Besides, the law does not require that the employees of an electric service company possess a high degree of skill; it only requires them to possess such skill as is ordinarily and reasonably commensurate with the character of work to be performed by them.

10. ————: ————: **Contradictory.** An instruction authorizing a verdict for plaintiff if defendant's employees, sent to inspect electric wires entering her house, did not possess "a high degree of skill," and another authorizing a verdict for plaintiff if such employees possessed "all the qualifications of competent and skillful workmen," but nevertheless "failed to exercise ordinary prudence and care in their duties," are conflicting and confusing.

11. ————: **Assurances of Safety: By Employee: Broader than Allegation.** Mere workmen, who are not officers of an electric service company, are not authorized to give general assurances of safety to a customer in the use of a particular electric appliance, although sent by the company to inspect and repair a defective condition in the appliance. General assurance of safety is beyond the scope of their employment, and must eminate from the employer. Besides, an allegation that the workmen "made a test of the appliances and informed plaintiff that the defective condition had been remedied and that the appliances were in a safe condition for use" is not

sufficient to authorize an instruction to return a verdict for plaintiff if defendant "negligently and carelessly assured plaintiff that said appliances were safe for use when they knew, or by the exercise of ordinary care could have known, that said appliances were defective and not safe for use in the condition in which they then were," there being no allegation or proof that the workmen were authorized to bind defendant with such general assurances of safety. The instruction was broader than the allegation, and broader than the facts proved.

12. ———: Roving Commission: Reference to Petition. An instruction authorizing the jury to return a verdict for plaintiff if they find and believe from the evidence that her "injuries were the direct result of the acts of negligence and carelessness charged in her petition, or any of them," is a roving commission to the jury to determine the law of the case, and is positive error where the petition is not read to the jury and there is no evidence to support some of its alleged acts of negligence. Besides, the jury should not be left to the pleadings to ascertain the issues; the better practice is to set forth in the instruction each specific act of negligence relied upon and proved.

Citations to Headnotes: 1, Appeal and Error, 4 C. J. 2708; Trial, 38 Cyc. 1543; 2 to 4, Electricity, 20 C. J. 66, 45, 67; 5 to 7, Trial, 38 Cyc. 1615, 1618, 1604; 8, Negligence, 29 Cyc. 587; 9 to 11, Electricity, 20 C. J. 69; 12, Trial, 38 Cyc. 1608.

Appeal from Chariton Circuit Court.—*Hon. Fred Lamb,* Judge.

REVERSED AND REMANDED

*S. J. & G. C. Jones, Collett & McKittrick, F. C. Sasse* and *Conkling & Withers* for appellant.

(1) Under the petition and evidence it was the duty of the court to give the peremptory instruction requested by defendant at the close of all of the evidence in the case. The evidence in the record fails to make a case. Curtis on Electricity, sec. 417; Minneapolis v. Cronin, 20 L. R. A. (N. S.) 816; Harter v. Colfax Elec. Co., 124 Iowa, 500; Brunell v. Electric Co., 188 Mass. 493; Smith's Admr. v. Middleborough, 174 S. W. 773. (2) Reversible error exists in instruction number one

given on the part of plaintiff. That instruction broadens the scope of the petition, viz.: (a) Paragraph "first" of said instruction submit to the jury a specification of negligence not pleaded in the petition. (b) Paragraphs "second," "third," "fourth" and "fifth" submit specifications of negligence not proven by the evidence, and therefore broadens the scope of the case and also permits the jury to determine for themselves the law of the case. Walquist v. K. C. Ry. Co., 292 Mo. 34; Daniel v. Pryor, 227 S. W. 105; State ex rel. v. Ellison, 270 Mo. 653; Christian v. Ins. Co., 143 Mo. 469; Fieldworth v. Railroad, 181 Mo. App. 640; Redding v. Railroad, 165 Mo. App. 130. (3) The court erred in giving instruction number two on the part of plaintiff. Said instruction did not confine the jury to the issues made by the pleadings; it enlarged the scope of the pleadings and evidence. Walquist v. Railroad, 292 Mo. 34; Fieldworth v. Railroad, 181 Mo. App. 640; Redding v. Railroad, 165 Mo. App. 130; Craton v. Huntzinger, 163 Mo. App. 640. (4) Instruction number three on the part of plaintiff contains reversible error in that it submits to the jury matters not shown by the evidence. There is no evidence showing that the men who made any repairs were employees of the defendant, that they were acting for defendant or that they had any authority to bind the defendant by any word or act of theirs. Neither is there any evidence showing what the line and scope of their employment were. State ex rel. v. Ellison, 270 Mo. 655; Walquist v. Railroad, 292 Mo. 30; Daniel v. Pryor, 227 S. W. 105; Fieldworth v. Railroad, 181 Mo. App. 640. (5) The evidence shows that plaintiff received her injuries by voluntarily taking hold of the ground wire to disengage it from the poultry wire. Therefore she cannot recover. Minneapolis v. Cronin, 20 L. R. A. (N. S.) 822. (6) Paragraph two of plaintiffs instruction numbered 1 is in direct conflict with defendant's instruction numbered 3. This conflict was bound to mislead the jury, to confuse them, and there is no way of telling which instruction the

jury followed. Stid v. Mo. Pac. Ry. Co., 236 Mo. 398; Allen v. Lumber Co., 171 Mo. App. 504; Paris v. Crutcher, 189 Mo. App. 150; Smith v. Railroad, 126 Mo. App. 123; Wollack v. Transit Co., 123 Mo. App. 167.

*John D. Taylor* for respondent.

(1) A demurrer to the evidence admits as true every fact which testimony tends to prove and every inference to be reasonably drawn therefrom. Lebrecht v. Miller, 192 S. W. 1050; Bingaman v. Hannah, 270 Mo. 611. On a demurrer to the evidence plaintiff was entitled to every reasonable inference from the evidence taken in the light most favorable to her. Link v. Hamlin, 270 Mo. 319; Wagner v. Wagner, 204 S. W. 390; Wojciechowski v. Coryell, 217 S. W. 638; Weiss v. Heat & Power Co., 227 S. W. 837; Curtis on Electricity, pp. 620, 729, 910; Montgomery v. Railroad, 181 Mo. 503. (2) There was no error committed in giving plaintiff's Instruction 1. Every allegation of negligence in the instruction is to be found in the petition. Moreover, this instruction is an instruction favorable to the defendant. It expressly prevents the jury from finding on any issue not set out in the petition. Lee v. Knapp & Co., 155 Mo. 610; Chadwick v. Transit Co., 195 Mo. 517; Montgomery v. Railroad, 181 Mo. 508. (3) There was no error in giving Instruction 2. This instruction read with Instruction 1 clearly states the law and expressly limits the jury to the acts of negligence pleaded. Montgomery v. Railroad, 181 Mo. 513. Nor is the reference to the petition error. Hartpence v. Rogers, 143 Mo. 633. (4) Instruction 3 merely informs the jury that, however skilled a workman might be, that skill does not excuse negligence. Appellant overlooks the fact that there was positive proof that Wires was manager of the defendant company; that he directed the installation of the lines from the house to the garage and chicken house; that the defendant company received compensation for material and labor; that when trouble was had with the

lights Wires was communicated with: that immediately following the communication with him men appeared for the declared purpose of making inspections and corrections; that when necessary they controlled the cutting off of the current; that it was the methods of correction, and that the inspection indicated both negligence and a lack of skill and competency. Appellant also overlooks the fact that the jury are entitled to draw reasonable inferences from facts proved. 2 Chamberlain on Evidence, art. 1027. (5) The evidence is uncontradicted that plaintiff received her injury before she discovered the condition of the wire on the outside. There is no evidence that she ever came in contact with the wire. This assignment of error on the part of appellant is not based upon any fact in evidence and is an unwarranted assumption. (6) There is no conflict between plaintiff's Instruction 1 and defendant's Instruction 3. Paragraph 2 of plaintiff's instruction complains because defendant permitted current to pass over the wires into the house when they knew the wires and equipment were in a defective condition. Defendant's instruction instructs the jury that they cannot find that defendant permitted an excessive voltage of electricity to pass into the house. This dealt with an entirely different situation and one upon which no issue was made in the trial. Moreover, there would be no conflict if the two instructions dealt with the same matter. Instruction 1 merely points out the grounds of negligence complained of and limits the jury to those grounds and denies the right to find for plaintiff on any other ground. Defendant's Instruction 3 instead of conflicting would in that circumstance limit the recovery further and would be harmonious rather than conflicting. Montgomery v. Railroad, 181 Mo. 513.

SEDDON, C.—Suit for damages for personal injuries. Plaintiff's petition alleges that during the year 1917 the Brunswick Light & Water Company built transmission lines from Brunswick to Keytesville, by way of Dalton, Missouri, for the purpose of transmitting elec-

tric current from Brunswick to Keytesville and Dalton, to supply the inhabitants of said towns and persons living along the route of said lines with electric current for lighting and mechanical purposes; that said Brunswick Light & Water Company entered into an agreement with plaintiff and her husband wherein said company agreed to furnish a transformer, all wiring, equipment and fixtures necessary for wiring and equipping plaintiff's home, together with competent and experienced men to do said work, for which plaintiff's husband was to pay the reasonable cost, and thereafter said company was to furnish electric current to be used in said home for lighting and mechanical purposes, and said company agreed to inspect and keep said transformer in proper operating condition and to furnish skilled and experienced men for the purpose of making inspection of said wiring and equipment used in said home, regulating and correcting any trouble that might arise from time to time and making any and all repairs that might be ·necessary; that thereafter the Brunswick Light & Water Company sold its plant, lines and other equipment to defendant, which has since continued to operate said electric plant by means of said transmission lines, and defendant has since said date continued to furnish electric current, and to furnish the service of persons for the purpose of making repairs, correcting trouble and making inspections, to plaintiff and her husband at their home near Dalton, conducting and carrying on the agreement theretofore made with the Brunswick Light & Water Company; that on the —— day of June, 1921, either because defendant was permitting an unusual and excessive amount of current to come from its transmission lines through said transformer and into plaintiff's home, or because of some defect in wiring and equipment in said home, the electric current was escaping or charging parts of said equipment with which it was necessary to come in contact in using same, so that a person would receive a shock when using same; that immediately upon discovery of said condition, plaintiff

communicated the fact to defendant by notifying the person in charge of its office at Brunswick, and within a short time thereafter defendant's manager sent certain employees to plaintiff's home for the purpose of making inspection and repairing and correcting the defective condition; that they made certain changes, corrections and repairs on said occasion, but failed to correct the defective condition; that plaintiff thereafter, on a number of times, notified defendant of such conditions and called upon it to repair and correct such conditions so that said appliances could be used in the usual and ordinary manner safely and without damage to persons and property, and defendant's manager at Brunswick caused certain employees to come to the premises and to make an inspection of the equipment, appliances, fixtures and wiring therein for the purpose of correcting and repairing the conditions existing in plaintiff's home, and on said date, after having made certain tests, repairs and changes as they deemed necessary, said employees made a test of the equipment, appliances and fixtures installed in said home and informed plaintiff that the defective condition had been remedied and that the wires, fixtures, equipment and appliances were in a safe condition to be used in the usual and ordinary manner for which they were intended; that within the period of about one hour thereafter, plaintiff undertook to use an electric iron, a part of said equipment and appliances, and because defendant, its servants and employees negligently permitted and caused current in dangerous and deadly amount to pass over the wires and through the equipment into said home, because of their failure to properly and carefully inspect and repair the wires, equipment and appliances in said home, and because of negligently failing to furnish persons possessing the proper and necessary skill in making such inspection and repairs, plaintiff, while using said electric iron, received a severe shock by a charge of electric current passing over and through said wires, appliances and equipment as to render her unconscious and so that her left hand was seri-

ously burned and injured, resulting in its amputation, and she was otherwise severely burned about her back and body and suffered a severe nervous shock; and that plaintiff was injured because of the negligence and carelessness of defendant, its servants and employees, as aforesaid, in permitting an excessive and dangerous amount of electric current to pass from its transmission lines over and through the wires, equipment and appliances in said home, and because of their negligence and carelessness in failing to make proper inspection and proper repair of said electrical appliances, and because of lack of skill and knowledge on the part of defendant's agents who attempted to inspect and repair its said lines and the wires, equipment, fixtures and appliances in said home.

Defendant's answer is a general denial and plea of contributory negligence.

The trial resulted in a verdict and judgment for plaintiff for $10,000, and, after unsuccessfully seeking a new trial, defendant appeals.

Plaintiff lived on a farm about one and three-quarters miles west of Dalton and about seven miles from Brunswick. The Brunswick Light & Water Company, in 1916 or 1917, constructed a transmission line along the road west of plaintiff's home. In the fall of 1917, plaintiff's house was wired for electric lights under arrangement made with a Mr. Nickell, working for the Brunswick Light & Water Company. Plaintiff and her husband purchased, paid for and owned the transformer, the wires running from the transformer to the house, the wires in the house, and the fixtures, including the electric iron, and the Brunswick Light & Water Company installed them. In November, 1920, Albert Wires, defendant's manager at Brunswick, with some helpers, extended the electric wires from the north side of the house to a pecan tree about thirty or forty yards northeast of the house, and near which was a chicken house, and from that tree west about one hundred feet to a garage. Defendant mailed plaintiff's husband a bill for the cost

of the wiring and equipment and the work of installing the same, which bill was paid by plaintiff at defendant's office in Brunswick on December 10, 1920, and defendant's receipt taken therefor.

Plaintiff's injuries occurred on Thursday, June 30, 1921, about four o'clock in the afternoon. She testified that, on the Monday before, she had been using an electric washing machine, when a storm came up and she switched off the current. About two hours after the storm, she reached up to turn the switch on and there wasn't any current. She then called the light office at Brunswick and asked for defendant's manager, Wires, and told him there was no current and asked him what the trouble was. He told plaintiff it was probably due to a fuse blowing out of the transformer. She asked if he could send a man, and he told her the roads were very bad, but as soon as they could get to it they would send a man. On Tuesday plaintiff telephoned Wires again and asked if he would send a man. He said he would, and about eleven o'clock Tuesday morning two workmen came to the house and asked what the trouble was. Plaintiff told them she didn't know, only there wasn't any current. One of the men called the light office on the telephone and asked them to shut off the current. The other workman went to the transformer, and when he came back, one man pressed a push button and the lights came on and the men left. Immediately after dinner plaintiff, intending to complete the washing, reached up and switched on the current and it "shocked her." She then stepped over to the machine, started the ringer in motion, and reached down in the tub to get a garment and put it on the wringer, and, as she said, "I clung to it—couldn't let go. The cord was very long and very heavy and sometimes while at work I would find it on the floor. While still hanging to that, it drew me down on the washing machine. I reached out with my foot and pulled the cord. Of course, that stopped the motor." She then called Mr. Wires on the telephone and reported the trouble and asked him to send a man. Plaintiff tes-

tified: "There was such a peculiar noise through the house, and that worried me. Whenever I touched the buttons, just touching them would shock me." On Thursday afternoon, about three o'clock, two workmen came and asked what the trouble was. Plaintiff told them she "didn't know, only that everything I touched shocked me." The first thing they did was to attach something to the meter, which was on the east porch of the house about three feet from the washing machine. They switched on the current and one of the men told plaintiff "it stung him. He put a plug in and waited awhile and then he told me that there must be a light on somewhere, said the current was being consumed. I went over the house to make sure there was no light on. I came back and reported there wasn't." The workmen then left the house and went out to the hen house and the garage. They could not find any trouble in the house. They came back and said they could find no trouble and asked for a ladder. "They went around to the west of the house where the wires from the transformer entered the house. One of the workmen went to the truck and got a roll of wire. Came back, and he took that wire and scraped back the insulation on the one end and bent it to form a hook, got up on the step-ladder and hooked it over one of the wires that ran from the transformer to the house and stuck one end into my flower bed." There were some flower plants on the west side of the house, over which plaintiff had laid some poultry wire. The men then stepped into the dining room and one of them pressed the button and the lights came on and he said it did not shock him. They stepped over to the ironing board and put the cord into the electric iron and waited until the iron was warm. One man took hold of the iron and said, "Now, Mrs. Kuhlman, it seems to be all right. You try it. We think it is all right." Plaintiff said, "Do you think it safe for me to use the current?" They said, "Yes, go ahead and use it." The men then left and plaintiff put the plug in the iron and after about a half hour started ironing. She testified:

"When I found the iron was hot I started to iron and I hadn't been ironing very long, probably fifteen or twenty minutes, probably not that long, I was standing at the ironing board ironing, there was a sputtering sound and a flash and the current came on and I couldn't let go. I fought—when I found myself I was on the floor beside the ironing board. I found my hand was burned. There was a cot close by and I went to it and laid down a second. I realized then I was hurt and remembered I was alone. I then went to the telephone and asked central to call a doctor and send me help. I was just smothering. I started out the west door. There was a hammock on the west porch and I started for that, thinking it would be cooler. As I opened the west door I found the yard afire. When I stepped down that poultry wire was red hot the whole length of the house and the wire was dangling up against the poultry wire. I picked up a board lying there and reached over to get the poultry wire away from the house. The next thing I knew some of my neighbors were bending over me.

"Q. So your call for help was before you went out? A. Yes, sir, before I opened the door and before I discovered there was anything wrong any place else.

"Q. In attempting to get the wire away did you use or attempt to use your left hand? A. No, sir.

"Q. Was it in any condition to use? A. No, sir, it was not."

Mrs. Brandt, a neighbor, testified, as a witness for plaintiff, that she heard the telephone ringing and went to the telephone and heard some one hallooing and, after she learned it was at Mrs. Kuhlman's, she and her husband went to the Kuhlman home. They reached there between 4:30 and five o'clock in the afternoon. They found Mrs. Kuhlman in the driveway some distance from the house outside the yard fence, where she had fainted and fallen to the ground. Witness found the flesh was burned from plaintiff's left hand and into her hand so that one could see the bone, and the flesh was burned off the thumb. She had two or three bad burns

on both her left and right shoulders and her right wrist was burned, looked like they were cooked. Every piece of clothing she had on had one hole in it at least. There were two or three holes burned in her waist.

On cross-examination, witness testified:

"Q. Did you examine any place to see where she received the burns, look around to see where she received them? A. Yes, sir.

"Q. Where did you find them? A. On the side porch.

"Q. What did you find there? A. Wires hanging down.

"What made you think she had been burned on that wire? A. *She said she had.*

"Q. *Did you hear her say that?* A. *Yes, sir.*

"Q. How did she get burned on it? A. *She said against that end.* Said she took a two-by-four and put it against the back of the wire to pull it away from the house. She said she didn't know how, but she got hold of the wire with her hand.

"Q. *When did she tell you that?* A. *When I got there.*

"Q. Is that what she said, that the way she got hurt was by taking hold of the wire? A. She said the iron hurt her first.

"Q. And then she said she went out and took a stick to release the wire from the chicken wire, and got hold of it with her hand and that is what burned her? A. Yes, sir.

"Q. And you went and looked and saw on the wire where she had hold of it did you? A. Yes, sir.

"Q. You said you saw indications on the wire where Mrs. Kuhlman had hold of it. What did you see to indicate she had hold of the wire? A. Something kind of rubber off of it.

"Q. You spoke about her hand being burned to the bone. Did it look like there was any flesh on the wire? A. No, I didn't see any."

Fred Laker testified for plaintiff, that he went to the Kuhlman home the day plaintiff was burned. He

found a wire wrapped around at the top on the main line about six or seven times, running down to, but not touching, the ground. It was hanging down against the poultry netting. The netting was practically welded together and the grass around the netting was burned for a distance of about two feet. On cross-examination, he testified:

"Q. What did you go for? A. They told me Mrs. Kuhlman was hung on a wire; that I should bring suitable gloves, etc., to remove the hot wire.

"Q. Did you see Mrs. Kuhlman? A. Yes, sir.

"Q. Did she say anything about being hung on a wire? A. No, sir, she was screaming when I arrived.

"Q. Where was she when you saw her? A. In the yard just west of the house.

"Q. Then you saw the wire where the insulation was burned? A. Yes, sir.

"Q. And did that look like the same stuff that was on her hand? A. The color was practically the same.

"Q. Didn't you state yesterday that you saw evidences where she burned her hand on that wire? A. I stated she burned her hand on the wire.

"Q. You still state the same thing? A. Yes, sir.

"Q. What do you mean when you say you saw where she burned her hand on the wire? A. The only reason I could see that she burned it was on account of finding the overheated wire there.

"Q. And what else? A. And the burn on her hand.

"Q. Like if a person would take hold of a wire that way (indicating)? A. Yes, sir, as if you would take hold this way (indicating), it would sear the edges here and there."

H. J. Laker, another witness for plaintiff, testified:

"Q. Who called you? A. I received word through central office at Dalton that there was some trouble in regard to electric current—somebody probably being burned or something.

"Q. What was the information you got? A. The information that came to me was that someone was hung

up on a live wire out at Kuhlman's and, of course, knowing what the consequences would be in something like that we got ready and went.

"Q. Did you see Mrs. Kuhlman? A. Yes, sir.

"Q. Did you see her hand? A. Yes, sir.

"Did you hear her say anything about how she got burned? A. Yes, and no.

"Q. Tell the yes and no both. A. She complained about being burned with electricity, but was hardly in shape to tell exactly how she was burned.

"Q. What did she say? A. She said at first she was burned on the iron, then she said probably some other way as well.

"Q. What other way? A. I don't know.

"Q. What did she tell—did she tell you she was burned on the wire? A. Yes, she stated that it looked evident that she had been burned on wire.

"Q. Why did she say that? A. Because of the burn on her hand—the charred appearance.

"Q. What did she indicate that by? A. The insulation on the wire, by the burn coming in contact with something else.

"Q. Tell me again what was on the wire that indicated she had hold of it? A. The wire was charred on the insulation, and of course there were particles of flesh charred in her hand as well. It might have indicated she might have gotten hold of it.

"Q. Then wasn't there some flesh on the wire? A. I wouldn't be positive there was flesh. If there had been it would have been burned.

"Q. Something there had been burned? A. Yes, sir. It might have been the insulation.

"Q. In the presence of two or three gentlemen you stated without any qualification whatever there was flesh on that wire, burned flesh on that wire? A. I said possibly there might have been flesh on the wire from the looks of the charred condition of the wire.

"Q. Didn't you also state there was no doubt about her being there because the wire showed it? A. I don't recall it.

"Q.  Do you deny it?  A.  I don't deny saying it, but a man can be mistaken."

Plaintiff's husband testified in her behalf:

"Q.  Did your wife get her hand burned on that wire over there?  A.  She told me she didn't know whether she got hurt on that wire or not, but does know she got hurt in the house.

"Q.  Why did you keep that wire?  A.  I kept it to show at the trial.

"Q.  Your wife told you she got her hand burned on that wire?  A.  She never did tell me she got her hand burned on the wire.

"Q.  Are you sure she never did tell you that?  A. Not on that wire.

"Q.  Did you tell anybody your wife told you the way she got her hand burned was by taking hold of that wire?  A.  No, sir, I never told anybody that.

"Q.  Did you tell anybody your wife told you the way she got burned was by taking hold of that wire?  A. I have told someone that she tried to get the wire away from the house, but I didn't say she got hurt on the wire, and I didn't say whether it was the poultry wire or that wire.

"Q.  Your wife told you she did not know whether she got burned on that wire or not?  A.  Yes, sir, she says if she got hurt on it she don't know it.

"Q.  What made it necessary for you to ask her about the wire?  Had she told you before that she got hurt on the iron?  A.  Yes, sir, of course she did.  Said she was ironing.

"Q.  If she told you she got hurt on the iron what did you ask her about the wire or ask her anything about the wire for?  A.  I just simply asked whether she got hurt outside.

"Q.  Didn't it satisfy you?  A.  I was concerned whether she got hurt inside or outside.  I thought there was no harm asking her where she got hurt."

Witness Taylor testified for plaintiff that he had examined the wiring in the pecan tree, which was about

forty or fifty feet north and east of the house and almost in front and slightly to one side of the chicken house. The residence house faces west, the transformer was south and west from the residence, and the wires ran from the transformer into and through the residence to the meter on the back porch, thence north and east through the pecan tree to the chicken house and thence forty or fifty feet west to the garage. The wires were fastened to two insulators fastened to a limb of the pecan tree. The insulation was off one of the wires which passed through the pecan tree. There was a burned place on another limb of the tree, one wire touching the burned place and the other wire almost against it. Several photographs showing the location of the wires and the burned place on the limb of the tree were identified and introduced in evidence.

Witness Sanderson testified as an electrical expert on behalf of plaintiff. He made an inspection of the wires passing through the pecan tree and found that they had been strung so that they rested against the tree and were not supported at that point with insulators. Witness said that there should have been glass insulators or knobs to keep the wires away from the trees. The effect was that the swinging of the wires in the wind would wear on the insulation and when the insulation was worn off there would be a "ground" on the system. Witness defined a "ground" as "something that interrupts the direct flow of current from the line and throws it off onto something else—interrupts the natural flow of the current. It throws the current back over some other part of the line. It created a disturbance on the line and sent the current back on the lines through the system in the house." Witness testified further:

"Q. If there was a ground such as has been described here, with the condition you have testified about, and a person were ironing with this iron and by chance would get a shock that would cause the person to throw her hand against this iron—the other hand against the iron, coming in contact with it in some way, if it would

cause a burn on the hand that is thrown against it? A. Of course, naturally, as soon as they touched the iron with the other hand their body would complete the circuit and the current passes through.

"Q. I will ask you to say whether or not if she should happen to have touched this iron somewhere, the metal part, with her fingers in any way, and then had come in contact with the iron in some other way, it would have made a dead ground in her body? A. Yes, she would keep the circuit in her body.

"Q. I will ask you whether it is ever proper in the construction of electric lines to permit the lines to come in contact with green trees or trees where moisture might be absorbed so as to cause the condition there? A. It would be a very poor construction.

Relative to the electric iron, the witness testified:

"Q. Is there such a thing as a short that develops in these irons? A. Yes, sir.

"Q. What is the thing that will do it? A. The wires inside will become unwound around the mica—a silver composition metal.

"Q. Suppose a short develops in the iron, what will be the consequences? A. It won't heat.

"Q. Will it have any effect on the fuses? A. It will blow the fuses.

"Q. You say it will prevent the iron from heating? A. Yes, sir.

"Q. How long will it be before it will blow the fuses? A. It might be in ten to twenty-five seconds, according to the back resistance of the current.

"Q. What is the purpose of those fuses? A. They are to protect the wires in the house from receiving too much current—the plug would blow if there was more than the alloted amount of amperes passing through.

"Q. What is meant by ampere? A. The amount of current. Voltage is speed, and an ampere is a unit of current.

"Q. It is not the volt that is dangerous, but the ampere? A. The ampere will burn—the volt will kill.

"Q. Those fuses, what amount of electricity will it take to blow them? A. They are made, I think, for about twenty amperes—a house fuse runs from ten to twenty amperes. If the amperage gets high the fuses will blow.

"Q. What amount will it take? A. It is gauged to about twenty-five. If it went over twenty-five it would blow, breaking the circuit and stopping the current. If they were fifteen and it got over eighteen or twenty they would blow.

"Q. Mr. Jones has inquired about what might happen if there was a short in the iron. Were you present when the iron was tested? A. Yes, sir.

"Q. The test was made at Keytesville, was it not? A. Yes, sir.

"Q. It was brought from the Kuhlman place and taken to the electrical shop of J. W. Taylor at Keytesville? A. Yes, sir.

"Q. When the test was made the iron was found to be in good condition? A. Heated up nicely.

"Q. Assuming these two plugs were taken out of the switch, there is a plug marked twenty amperes and 125 volts? A. That means it will stand 125 volts.

"Q. If conditions were right and there was no ground then, you have stated, there would be no danger if you came in contact with the iron connected up? A. Only from the heat.

"Q. If you would touch your fingers to it it would give you a heat burn and not an electrical burn? A. Yes, sir.

"Q. If a ground increases the amperage and causes that condition would do what—what effect would it have on this? A. It would create a ground that would be dangerous if you touched it.

"Q. Might that be done without blowing out one of those fuses of 125 volts? A. It could. While the

test meant it would hold up to twenty-five amperes, sometimes it holds up to thirty amperes.

"Q. When you have 110 to 125 voltage and conditions might arise to cause a ground and I should come in contact so as to make a circuit here, would it burn? A. Of course it would burn.

"Q. When it stepped up to a certain point would it blow those fuses? A. It ought to blow the twenty-five amperes or whatever it is marked, or very close.

"Q. How many amperes does it take to heat an iron? A. You can heat an iron with five amperes.

"Q. About kicking the current back into the iron —what effect would it have on the iron? A. It would ground it. I mean to say it would cease to be insulated because the metal itself is grounded then and if you put your hand on it you would get an electrical shock.

"Q. About these amperes, how high would it have to get to make that shock? A. You can get an electrical shock on one-fourth ampere or one-half an ampere.

"Q. Would it make any difference in handling the iron whether it was handled wet or dry? A. No. That is seasoned wood—perfectly dry. That would have to be soaking wet to become a conductor of electricity. The moisture is a conductor, it is not the wood that conducts.

"Q. You tested this iron, I believe you said? A. Yes, sir; heated it up.

"Q. And it heated up—was all right? A. Yes, sir; it heated up nicely.

"Q. If a short had occurred in the iron what effect would it have had on the fuse? A. A direct short would blow it.

"Q. Is there any way of telling what kind of short it would take to blow the fuse or how quick it would do it? A. If there was a short it would do it instantaneously.

"Q. It would take an excess of twenty or twenty-five ampres to blow the fuses? A. Not if there was a short.

"Q. Then an overflow of electricity? A. They are made to carry a momentary excess of ten to fifteen per cent. They should blow, that is what they are made for, to blow beyond twenty or twenty-five amperes.

"Q. As long as a person has his hand on the handle is there any danger? A. No, sir.

"Q. The only danger then would be in coming in contact with the metal? A. Yes, sir.

"Q. That would only be in cases where it is charged with electricity? A. Yes, sir.

"Q. The heat of the iron itself wouldn't have that effect? A. The heat of the iron would burn, but it wouldn't be an electrical burn.

"Q. Even if the metal was charged with electricity, as long as a person had hold of the iron in that way there would be no danger? A. No.

"Q. Then a person using that iron either with the right or left hand with a dry handle, could use it in safety unless by some way she would come in contact with the metal? A. Yes, sir.

"Q. The iron would't ground it? A. The iron wouldn't ground it unless it was defective itself.

"Q. You say it wasn't? A. It wasn't at the time it was tested."

Witness also testified that in his opinion the ground wire should have been located between the pecan tree and the rear of the house, instead of to the west between the transformer and the front of the house, as placed by defendant's employees. Furthermore, that the ground wire should have been anchored to a plate about two or three feet in the ground to prevent the wire pulling out of the ground.

Witness Keller testified as an expert witness for defendant that the placing of the ground wire between the transformer and the house, as done by defendant's employees, was proper, the purpose being to prevent a high voltage from coming directly into and through the house; that the ground caused by the wires coming in contact with the pecan tree, instead of sending the volt-

age back through the house, would probably tend to lessen the voltage slightly, causing no harm, but only a dimming of the lights in the house.

"Q. Assuming that the wire is properly constructed running from the transformer into the house and it is connected by twenty amperes—125 volt fuses, anything in excess of twenty-five amperes—125 volts would blow that out if properly constructed? A. It is supposed to.

"Q. If it is not properly wired and not properly constructed, it is reasonable to say that it wouldn't blow it out even though it ran over twenty amperes or 125 volts? A. It will never run over that. It might blow out at less, but it won't stand more than that.

"Q. I believe you have had some experience with irons? Know anything about them? A. I know how they are made, yes sir.

"Q. I will ask you if the wood handle on the iron is a conductor or non-conductor? A. Non-conductor.

"Q. Suppose the metal part of the iron becomes charged with electricity, if the person using it keeps his hand on the handle, how would it affect him? A. I wouldn't think it would affect him at all.

"Q. Would it? A. If they keep their hand on the handle, it wouldn't.

"Q. You say this handle is put on here—that it is a non-conductor—that is true, I believe? A. Yes.

"Q. This is put on for two reasons is it not, this wood handle? A. I don't know how many, probably two.

"Q. One it is a non-conductor of electricity and the other it is a non-conductor of heat? A. Yes, sir.

"Q. And it was put on there so as to handle it and also to keep away from any electric current? This iron is so constructed by having the wires wrapped in mica that this outside is supposed to be a non-conductor of electricity? A. No electric current supposed to be in touch with it.

"Q. If the iron is in perfect condition and the wiring attached is in perfect condition there ought never to be an electric current? A. No, sir.

"Q. Suppose that iron is in proper working order, the coils inside are all right, will electricity get into this part of it? A. I should say not. If it is in correct working order it wont.

"Q. What, if anything, would make it charge this with electricity? Is there anything? A. It would have to break through the mica to get to it. It would have to break through the insulation.

"Q. Some inside insulation would have to break through? A. Yes, sir.

"Q. So it is clear that so long as that insulation isn't broken and the iron is in proper condition the metal will not become charged with electricity? A. Yes, sir.

"Q. That would be true whether there was any defect anywhere else in the system, or not? A. Defects elsewhere have nothing to do with that.

"Q. Then so far as the iron is concerned, it depends upon its own mechanism whether that holds up, regardless of what defects may exist somewhere else? A. Yes, sir.

"Q. You say that something would have to happen to the iron inside for the current to get in here—something would have to break down the entire mechanism? A. I should say so, yes.

"Q. Now, then, what would tend to break that down? A. Faulty construction of the iron or too much voltage.

"Q. This iron is a Hot-point iron, marked voltage 110 and 5.2 for amperage. That means this iron was made to use with 110 volt current? A. Yes, sir.

"Q. And if for some reason more than 110 volts would get into that it would naturally tend to cause some change of condition that would electrify that iron? A. That might be true.

"Q. Suppose excessive voltage was to go in, what effect, if any, would it have on the wall switches? A. It would break them down.

"Q. If those switches broke down, what would be the effect? A. The fuses would blow.

"Q. Then what would be the consequence to the iron? A. It would put the iron out of circuit.

"Q. That means there would be no electricity going into the iron? A. Yes, sir.

"Q. But if that wiring and those fuses were such that it would get above 110 volts it might break this down without blowing the fuses? A. It might be possible."

Plaintiff's physicians testified that the palm of her left hand was burned to the bone, exposing the bones and tendons. The burn extended down on the tabs of the three middle fingers and thumb and back on the wrist. There were two holes burned in her back on the left and right shoulder blades, and a number of smaller holes burned over both hips, similar to the burn on the hand. The burn had destroyed the blood supply and nerves in the palm of the left hand, causing it to become dead and necessitating amputation above the wrist. Plaintiff also suffered a severe shock to her nervous system, which her physicians deemed permanent.

I. At the outset, appellant urges that respondent failed to make a case for the jury, and that, therefore, the court *nisi* erred in refusing appellant's peremptory **Demurrer to Evidence.** instructions offered at the end of plaintiff's case and again at the close of all the evidence. In passing upon this assignment of error, it is our duty, as it was in the first instance the duty of the trial court, to consider as true the testimony of respondent and her witnesses, and to allow in her behalf, in considering the evidence, every reasonable inference which a jury might draw from the facts and circumstances in the case. This is trite law. [Wagner v. Wagner, 204 S. W. 390; Lebrecht v. Miller, 192 S. W. 1050; Bingaman v. Hannah, 270 Mo. 611; Link v. Hamlin, 270 Mo. 319; Montgomery v. Railway Co., 181 Mo. 477.]

Appellant claims there is no evidence in the record showing it to be the owner or operator of the electrical transmission system with which respondent's premises and equipment were connected. It is true that respondent offered no direct evidence to that effect. However, we think that fact was inferentially proved. Respondent testified that Mr. Albert Wires was the manager in charge of the Brunswick office of the Water, Light & Transit Company, the appellant corporation; that in November, 1920, she made arrangements with Mr. Wires to extend the light wires from her residence to the garage and chicken house in the rear; that a bill was mailed to her on appellant's stationery for the cost of said work and equipment, and that she paid the bill at appellant's office in Brunswick and took its receipt therefor. Furthermore, respondent telephoned this same Mr. Wires a day or two before she was injured to send a man or men to her home and in response to the call, two workmen came on the afternoon of her injury. Absent evidence to the contrary, we think the facts shown are sufficient to establish appellant's ownership and operation of the electrical transmission system.

Again, appellant says there is no evidence in the record tending to show that the men who called at respondent's residence on the date of her injuries and who, at the time, placed the ground wire on her premises, were in its employ or in any way connected with appellant. We, likewise, think that fact was inferentially shown, in the absence of evidence to the contrary, by the testimony just referred to.

Appellant insists there is no evidence in the record showing any duty or obligation on its part to inspect the wires and equipment on respondent's premises. The record conclusively shows that the wires, equipment and appliances on the premises were purchased, paid for and owned by respondent or her husband. The original wiring in the home appears to have been done by the Brunswick Light & Water Company, and not by appellant. The equipment for the extension of the wires from the home

to the garage and chicken house were concededly furnished, and the work of installation done, by appellant, but respondent, or her husband, subsequently paid for and became the purchaser thereof. While there is some conflict of authority, the weight of authority seems to support the view that, if the appliances of the customer are not constructed or owned by the company generating the electricity, the company is not bound to inspect the same, and is not liable for an injury that is received by reason of defects in such appliances, where it has no knowledge of the defects, though the electricity which causes the injury comes from its generating plant. [Curtis on Law of Electricity, sec. 417; Minneapolis General Electric Company v. Cronon, 166 Fed. 651; Brunelle v. Lowell Electric Light Corporation, 188 Mass. 493; National Fire Insurance Co. v. Denver Consolidated Electric Co., 16 Colo. App. 86; Smith's Admx. v. Middlesboro Electric Co., 174 S. W. (Ky.) 773; Peters v. Lynchburg Light and Traction Co., 108 Va. 333.] The reason given for the above rule by most of the authorities is that an electric light company has no authority to enter upon the private domains of individual customers and inspect the private property owned by such persons, without authority from them to do so. As said in Minneapolis General Electric Co. v. Cronon, supra: "Can the company, unbidden, enter at will the private house of the citizen and pass into its various rooms to inspect these wires every day to see that they are in proper condition for the reception of the electricity it has contracted to sell? If so, it must employ a large retinue of competent men to do this work; and as absolute insurers under the rule contended for, the necessities of the situation would demand that they should have free access to these buildings at all hours and under all conditions. Such a rule of law would tend to put concerns furnishing electricity to private houses out of business." But, where the electric service company undertakes to make repairs, as distinguished from original installation and inspection of the equipment and appliances on the premises of the cus-

tomer, then a different rule of law is applicable. Having engaged or undertaken to make repairs, it must use care commensurate with the duty and obligation it has voluntarily assumed, and failure upon its part to use such care renders it liable for ensuing injury and damage. [Curtis on Law of Electricity, sec. 494; Fish v. Electric Co., 18 S. Dak. 122.] In the instant case, the respondent in her petition charges appellant with negligence in failing to make proper repairs of the electrical equipment on her premises after it had undertaken to make said repairs. The evidence tends to show that appellant sent its workmen for the purpose of making repairs, if necessary, and it was the function of the jury to determine whether appellant had used due care in making the repairs.

Lastly, appellant urges that respondent failed to prove that she was injured while using the electric iron, as charged in her petition. In other words, appellant claims that respondent has not shown any causal connection between her injuries and the use of the electric iron. We have carefully scrutinized the record on this point, and it seems to us that respondent has come dangerously close to failing to establish by clear and satisfactory evidence that she received her injuries from the electric iron. She, alone, of all the witnesses, testifies to that fact. Two of her witnesses, Mrs. Brandt and H. J. Laker, testified that she said she had been burned on the ground wire near the front porch outside the house. Another witness, Fred Laker, testified that she burned her hand on the wire. While we do not say that it is impossible that respondent may have been burned on the electric iron, yet the nature of her injuries, as shown by the evidence, strongly indicates that she may have been burned on the ground wire. Not only was the palm of her left hand and the inside of the three fingers and the thumb burned to the bone, but she was similarly burned on the back of the body, suffering burns on both the left and right shoulder blades as well as several burns over both hips. Mrs. Brandt testified: "Every piece of cloth-

ing she had on had one hole in it at least. There were two or three in her waist.'' The physical facts strongly indicate that her injuries were such as may have been caused by grasping in her left hand the dangling ground wire and, upon her being thrown to the ground, that the wire had come in contact with her shoulders and hips, burning through the articles of clothing she wore at the time. Furthermore, the evidence shows that the electric iron was tested by respondent's expert witness some time after her injuries and prior to the trial, and found to be in good condition, ''heated up nicely,'' and apparently without break or ''short'' in its insulation. However, respondent testified that she was burned on the electric iron before she went into the yard to get the hot poultry wire away from the house. For the purpose of passing upon the demurrer, we must consider her testimony as true and allow her every reasonable inference which the jury might draw from the facts and circumstances in evidence, leaving it to the jury to weigh the evidence adduced. The assignment is, therefore, ruled against appellant.

II. Appellant assigns error in the giving, over its objection, of respondent's instruction numbered one. The first paragraph of that instruction predicates a recovery upon ''the negligent, careless and

**Instruction: Broader than Pleading.** unskillful installation of wires and equipment in an improper, unskillful and unworkmanlike manner on the premises where she lived.'' A reference to respondent's petition clearly shows that appellant is not therein charged with any act of negligence in the *installation* of wires or equipment on respondent's premises. We have ruled a number of times that an instruction cannot be broader than the pleadings and that, when such an instruction is given, the error in giving the instruction is presumed to be harmful. [State ex rel. v. Ellison, 270 Mo. 645; Walquist v. Railways Co., 292 Mo. 34; Degonia v. Railroad, 224 Mo. l. c. 589.]

Paragraph "second" of the instruction authorizes a recovery by reason of appellant "permitting and allowing high tension electric current to pass over and through the wires, equipment and appliances installed on said premises when the same were in defective condition, which condition defendant knew, or by the exercise of ordinary care could have known." Appellant claims that there is no evidence in the record to the effect that it permitted *high tension electric current* to pass through respondent's equipment and appliances, upon which to base this paragrah of the instruction, and, therefore, the instruction submits a specification of negligence not proved by the evidence. We find this claim of error to be well grounded. The record does not show what voltage or amperage of electric current was passing through the wires into respondent's home at the time of her injury. Neither does it disclose what voltage or amperage constitutes a "high tension electric current," nor that respondent would not have been burned had a less voltage or amperage been passing through the wires. Respondent's expert witness testified that "you can get an electrical shock on one fourth or one-half an ampere." The expert witnesses offered by both appellant and respondent apparently agree that if the electrical current exceeded twenty-five amperes or 125 volts the normal result would have been to "blow" the fuses, resulting in a breaking of the circuit and a stopping of the current. In Harter v. Colfax Electric Light and Power Co., 124 Iowa, 500, that court, in ruling on the precise question here raised, said: "The trial court was in error in submitting the case to the jury on the theory that defendant sent a dangerous current into the house knowing it to be dangerous, for the reason that there was no evidence to sustain any such instruction. . . . The evidence shows without dispute or question that if defendant had sent into the hotel such a current of electricity as it is claimed it did, it would have burned out the fuses in the transformer, destroyed the meter, burned out all the fuses in the fixtures, and

*No Evidence.*

Kuhlman v. Water, Light & Transit Co.

destroyed the lights. None of these things occurred, however. . . . It is thoroughly demonstrated that defendant did not knowingly send into the hotel a current of dangerous voltage. Indeed, we are of the opinion that plaintiff could not have received the shock he claims to have had without some evidence thereof found in the other fixtures or lights of the hotel. And, as we have said, none of them were disturbed. The meter remained intact, and the transformer continued to perform its functions. None of the lights in the hotel were in any manner affected, and none were extinguished save the one in the bathroom, which fell to the floor. The testimony shows that it was a physical impossibility for these things to exist if such a current as plaintiff claims passed through him.''

Besides, the second paragraph of plaintiff's instruction is clearly in conflict with defendant's given instruction numbered three, which reads: ''The court instructs the jury that under the evidence in this case, they cannot find against the defendant on acount of the alleged charge that defendant permitted an excessive voltage of electricity to pass into plaintiff's residence.'' The two instructions, when taken together and read by the jury as its guide in arriving at a verdict, are contradictory, confusing, and inconsistent. In Mansur-Tebbetts Implement Co. v. Ritchie, 143 Mo. l. c. 613, we said: ''Irreconcilable and contradictory instructions are necessarily confusing to the jury, and invariably breed error. It cannot be said this is harmless error. We are not able to say which instruction the jury followed and which it disregarded.'' The foregoing language was quoted by GRAVES, J., with approval, in State ex rel. v. Ellison, 270 Mo. l. c. 656.

*Contradictory.*

But respondent answers that the maxim *res ipsa loquitur* applies in the instant suit, so that the burden is upon appellant to show that an excessive and dangerous amount of current was not sent through her home and appliances through its negligence, and, therefore, defendant's instruction numbered three should not have been given by the

*Presumptive Negligence.*

court *nisi*. But, whatever may be the rule in other juris-dictions, the rule is well settled in Missouri that the doctrine *res ipsa loquitur* does not apply where the plain-tiff bases his recovery upon specific acts of negligence alleged in his petition, instead of charging negligence in general terms. In that situation, plaintiff assumes the burden of proving the specific acts of negligence alleged, and, as in other cases, must recover, if at all, upon the negligence pleaded. In Pointer v. Mountain Railway Construction Co., 269 Mo. l. c. 114, we said: _"The peti-tion filed by plaintiff excludes the application of the *res ipsa loquitur* doctrine. This plaintiff has pleaded specific negligence, and in such case he cannot rely upon presumptive negligence under the rule *res ipsa loquitur* to make out his case. One who pleads specific acts of negligence must prove such negligence or enough of such acts to justify a recovery, and a failure so to do bars him from a recovery. And this is true although he might have pleaded negligence generally and by an invocation of the doctrine *res ipsa loquitur* had a recovery upon making proper proof. We have gone over this question thoroughly in several recent cases. [McGrath v. Tran-sit Co., 197 Mo. 97; Orcutt v. Century Building Co., 201 Mo. 424; Roscoe v. Metropolitan Street Railway Co., 202 Mo. 576; Price v. Metropolitan Street Railway Co., 220 Mo. l. c. 453 et seq.]" In the case at bar, respondent bottoms her recovery upon certain alleged specific acts of negligence, one of which is that appellant "negligently permitted and caused current in dangerous and deadly amount to pass over the wires and through the equip-ment into said home." The burden rested upon respond-ent to prove the specific act of negligence alleged and it did not devolve upon the appellant to show that it did not negligently permit and allow a high tension current to pass over and through said wires and equipment.

The "third" paragraph of plaintiff's said instruc-tion allows a recovery by reason of appellant "negli-gently and carelessly sending employees to inspect wires,

High Degree of Skill.

equipment and appliances on said premises *not possessing a high degree of skill."* (Italics are ours). There is no evidence in the record to support this paragraph of the instruction. The record discloses the fact that two workmen came to respondent's home on the afternoon of her injury in response to her telephone request, made of appellant's manager at its Brunswick office, to "send a man." Further than that fact, there is no evidence that these workmen did not possess a high degree of skill.

It does not follow, from the mere fact that respondent may have been injured through the negligence of appellant's employees, that they did not possess a high, or even the highest, degree of skill. Appellant's employees may have possessed the highest degree of skill and still have been chargeable with actionable negligence in the premises. This fact is recognized by respondent, as shown by her given instruction numbered three, wherein the jury were told that, "although you find the employees of the defendant company possess all of the qualifications necessary to competent and skilled workmen engaged in their line of business, if it has been shown by the evidence to your satisfaction that they failed to exercise the ordinary prudence and care in performing any of their duties on plaintiff's premises, which said duties were within their usual and ordinary line and scope of employment, and that, through their failure to exercise such care and prudence, the said Mary Kuhlman became and was permanently injured, then the mere fact that the employees doing such work may have been competent and skillful constitutes no defense for this action." Respondent's instructions were conflicting and confusing. In one the jury were given to understand that the appellant could be convicted of actionable negligence if it sent employees not possessing a high degree of skill, and in the next breath were told that, if the employees possessed all of the qualifications necessary to competent and skilled workmen in their line of business and failed to exercise

ordinary care in performing any of their duties, then the appellant could be likewise convicted.

The published reports of decisions of the courts of this State and other jurisdictions are filled with instances where employees possessing the very highest degree of skill have, through carelessness and negligence in the performance of their ordinary duties, subjected their employers to liability for injuries resulting from their carelessness. It is a regrettable fact, but nevertheless a truism demonstrated by our daily experiences, that "to err is human," and the best and most skillful among us are not free from this human frailty. Furthermore, we think this paragraph of respondent's instruction required of appellant more than the law demands. The law demands that the master furnish employees possessing only such skill as is ordinarily and reasonably commensurate with the work to be performed by them. [Harper v. Railroad Co., 47 Mo. l. c. 576; Jungnitsch v. Iron Co., 105 Mich. l. c. 282.] To require the employer to hire only those possessing a high degree of skill is more than the law demands. If the rule were otherwise, then this appellant would have been required to send an electrical engineer instead of a lineman or inspector to perform the ordinary duties of inspection and making repairs.

Complaint is made of the "fourth" paragraph of the instruction, but we are constrained to believe that, under the allegations of the petition and the evidence adduced, no error was committed by the trial court in giving the same. It would be safer, however, to omit the words "or lack of skill" therefrom.

The "fifth" paragraph of the instruction predicates a recovery upon appellant "negligently and carelessly assuring the said Mary Kuhlman that said wires, appliances and equipment were safe for use when they knew, Assurances of Safety. or by the exercise of ordinary care could have known, that the same were defective, and that the same were not safe for use in the condition they were then in." It is doubtful whether

this paragraph of the instruction is based upon any specific act of negligence charged in plaintiff's petition. The petition recites that defendant's servants and employees "made a test of the equipment, appliances and fixtures installed in said home and informed plaintiff that the defective condition had been remedied, and that the wires, fixtures, equipment and appliances were in a safe condition to be used in the usual and ordinary manner for which they were intended for said purposes." A careful reading of the petition indicates that the above quoted portion is a mere statement of matter of inducement and not the allegation of a specific act of negligence. But be this as it may, there is no evidence that the employees were authorized by appellant to make any assurances of safety in the use of the appliances and equipment or to bind appellant thereby. They were mere workmen, not officers, of appellant corporation and their authority to bind appellant by any statements they might make was necessarily limited. According to respondent's testimony, one of these employees took hold of the electric iron and said: "Now, Mrs. Kulhman, it *seems* to be all right. You try it." Whereupon respondent took hold of the iron and tried it herself. The employee then said: *"We think* it is all right;" to which respondent replied, "Do you *think* it safe for me to use the current?" and the employee answered, "Yes, go ahead and use it." Such statement on the part of the employee might well be taken to be the mere expression of a personal opinion on his part, upon which respondent had no right to rely as a positive assurance of safety made by and binding upon the appellant corporation. The identical proposition was discussed and ruled in National Fire Insurance Co. v. Denver Consolidated Electric Co., 16 Colo. App. l. c. 94, wherein the court said: "There is still another reason why the appellants must fail. They did not show that the electric light company was responsible for the conduct of the man who was sent there to look after the property at the time the chandelier fell. There is no proof that the depot master had any right either to in-

quire of the employee, or to rely on his answer, in settling the question of the presence or absence of danger. The chandelier fell and naturally put out some of the lights, and they telephoned for a man to come down to attend to the matter. This he did, and when he went up to the locality of the accident he discovered that the fuse had burned out, which put out the light and probably caused the destruction of the wire which permitted the chandelier to fall, though the latter proposition is not clear. When he came down he was inquired of by the depot master whether there was any danger, to which he responded no. There is nothing which demonstrates that he could bind the light company by this declaration. A workman sent to repair is not necessarily one who is competent to advise. It might be true the electric light company would be quite willing to be held responsible for the work done by the employee, or held responsible for his examination as to what ought to be done in an emergency of that description. This, however, in no manner establishes the fact, that the company would be willing to be held responsible, or ought to be held responsible, for a statement that the general situation was such as to be free from danger. This would assume a knowledge on his part of the condition of the wiring all over the building, and would presume an examination of the general situation to enable him to answer that direct question, and so answer it that the depot company could rely on it, and in case of failure hold the electric light company responsible. We do not believe his agency or his relations to the company were sufficiently established to bind the company by his declarations.''

We find that plaintiff's instruction numbered one, in the respects above mentioned, was broader than the pleadings and broader than the facts proved, and constituted reversible error. [State ex rel. v. Ellison, 270 Mo. l. c. 653; Degonia v. Railroad, 224 Mo. l. c. 589.]

III. Appellant assigns error in the giving, over its objection, of plaintiff's instruction numbered two, which

reads: "The court instructs the jury that if they find and believe from the evidence that the plaintiff while exercising usual and ordinary care in using the electrical appliances in her home received injuries resulting in the loss of her hand and other injuries, if any, detailed in evidence, and you further find that said injuries were the direct result of the acts of *negligence and carelessness as charged in plaintiff's petition,* or any one of them, and that no act of negligence on plaintiff's part contributed thereto, then your verdict should be for the plaintiff." (Italics are ours). Complaint is made that this instruction is a roving commission to the jury to determine the law of the case. The record does not show that the petition was read to the jury, and even if it had been, it is unlikely that the jurors, unversed in legal phraseology as they are, would have recognized, much less remembered, the several charges of specific negligence therein stated. The practice of making reference to the pleadings for the issues to be tried has been condemned by this court in Britton v. St. Louis, 120 Mo. l. c. 445, wherein it is remarked that "we recognize and approve the rule of practice that the jury must not be left to the pleadings to ascertain the issue." The better and safer practice is to incorporate in the instruction setting out plaintiff's theory of recovery each and every specific act of negligence relied upon and proved. Certain acts of negligence alleged in the petition are ofttimes abandoned by plaintiff on the trial, and more often are unsupported by evidence, as in the instant case, and a reference to the pleadings for the negligence relied upon for recovery tends to mislead the jury and grant to the jurors a roving commission to determine for themselves the law of the case.

Complaint is made against another one of plaintiff's instructions, but, inasmuch as there must be a retrial of the case, and the form and substance of the instructions may then take an entirely different turn, we find it unprofitable and unnecessary to discuss this assignment of error.

By reason of the assignments of error herein allowed, the judgment *nisi* must be reversed and the cause remanded, and it is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion of SEDDON, C., is adopted as the opinion of the court. All of the judges concur.