CHESTER GANDY v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellant.—44 S. W. (2d) 634.

Division One, December 21, 1931.

*E. T. Miller* and *Mann, Mann & Miller* for appellant.

*Sizer & Gardner* for respondent.

HYDE, C.—This is an action for personal injuries under the Federal Employers' Liability Act (45 U. S. C. A., secs. 51-59). Plaintiff obtained judgment for $30,000, from which defendant has appealed.

Plaintiff was injured while working in defendant's yards in Rosedale, Kansas. In these yards there was a lead track which came in, in a southeasterly direction, on a curve bearing to the south. Switch tracks 11, 12 and 13 ran from this lead track to the southwest. These tracks curved at the north end with the curve of the lead track. They were used to receive deliveries of cars from the Union Pacific Railway. The yards of the Union Pacific were nearby, and freight cars, which that railroad desired to deliver to defendant railroad, were frequently brought in over the lead track and switched onto one of these side tracks. Cars brought from the Union Pacific yards to defendant's Rosedale yards, crossed the Missouri-Kansas state line.

On the day plaintiff was injured a string or cut of twenty-five or thirty cars, coupled together, were brought from the Union Pacific yards to defendant's yards and switched on to track 13. The north car of the string was from a half a quarter to a quarter of a mile southwest of the lead track. It was not shown how many of these cars were loaded, nor what was the destination of each. There was evidence that they were mostly loaded; that some of them were to go to Fort Scott, Kansas, Springfield, Missouri, points in Oklahoma and other southern states; that some were empty cars being returned to defendant; and that others were to be delivered to industries in or near Rosedale for loading or unloading. Plaintiff was an oiler and light repair man. He had a co-employee, Nichols, called his buddy, with whom he worked. Their duties were to pack and oil the boxes on the cars and make light repairs. It was their duty to commence this work as soon as a cut of cars was delivered to the

tracks on which they worked in defendant's yard. At the time they were doing this work there were also inspectors inspecting the cars for other purposes. Some times the inspectors and oilers would commence work at the same end of the string of cars and at other times they would commence at opposite ends, depending, mainly, on where they were when the cars were brought in. After the cars were inspected, oiled and light repairs completed, the string was to be broken up, by switching crews, and the cars put into trains, which were being made up, or placed on other tracks for unloading or storage.

The defendant had promulgated a rule known as "the Blue Flag rule," which required that a blue flag by day and a blue light by night be placed on the track or at the end of a car, engine or train, when workmen were at work under or about it, and required employees to place such a blue signal before working at such places. The moving of any such car, engine or train, until the blue signal was removed by the person placing it, was prohibited. Plaintiff had worked in defendant's yards in Kansas City, Missouri, before coming to the Rosedale yards and had signed for a copy of this rule there. Plaintiff's evidence, however, was that his foreman in the Rosedale yards had instructed him that the blue flag was to be used there only at the south end of the yards; that the oilers who worked in pairs should look out for each other for cars coming from the north; that while he worked at Rosedale there was such a custom in use dispensing with the use of a blue signal on the north, and requiring oilers to watch for and warn each other; that only southbound trains were made up in the Rosedale yards; and that most of the switching was done from the south end. Plaintiff was corroborated in this by his only witness, a former airbrake foreman of defendant, who testified that formerly there had been an extra employee, who placed blue flags at the north end of trains or cars on the switch tracks, but he was taken off by defendant in the interest of economy; and that after a letter from one of defendant's officials complaining of delay the rule was modified at Rosedale and the custom of not using a blue flag at the north end established. His evidence was that usually only the deliveries from other railroads, and cabooses for southbound trains, were brought in from the north. This witness further testified that this modification of the Blue Flag rule saved time in making up trains, and that it was discussed at safety meetings of defendant's employees at which defendant's officials were present.

Plaintiff said that on the day he was injured the inspectors started at the south end of the string of cars after placing a blue flag there and had proceeded about half way toward the north end; that his buddy, Nichols, was on a track farther east, and that he could not

commence oiling until he came; that while waiting for him he walked south on the west side of the cars; and that after he passed from six to ten of the northernmost cars he discovered that there was a nut missing from the bolt of a carrier iron, which held in place the drawbar, under the coupler 'between two of the cars. He climbed between the cars to a point just inside the east rail, where he stooped down to reach the carrier iron. When he did so Nichols came up from the east, and plaintiff claims he told him to watch out for him while he put the nut on the carrier iron. He said that Nichols agreed to do so and was standing on the east side of the cars where he could see all the way to the switch at the north end of track 13. He testified that after he had been engaged for this purpose about three minutes the cars were moved by other cars being switched against them from the north and he was knocked down and run over. He was so injured that it was necessary to amputate his right leg about three inches below the hip joint. Nichols gave him no warning. He said he was not told to watch, did not see the cars coming, and did not know that there was no blue flag at the north end.

Defendant produced a number of witnesses, among them being three inspectors who were working on the train at the time plaintiff was injured, all of whom denied the custom testified to by plaintiff. The inspectors said they put up a blue flag at the south end of the string and did their work without putting a flag at the north end. One of them admitted that he knew there was no flag at the north end, but said it was Sunday and a slack day. They stated that they were violating the Blue Flag rule, but they and defendant's other witnesses testified that the rule was enforced at all times; that no custom of not using a blue flag at the north end ever existed; and that no instructions, dispensing with it, were ever given. They further testified they were subject to a penalty for violating the rule and that employees were penalized for such violation. The letter referred to in plaintiff's evidence was introduced in evidence. It stated that important trains were being delayed by use of the blue signal where not necessary and pointed out particular work which could be done without its use.

It was further shown, by defendant's evidence, that switchmen on the west side of cars backing into track 13 from the north could not have seen Nichols, nor been seen by him, on the east side of the cars where plaintiff was working. Plaintiff, on cross-examination admitted this, and said that he did not know where they were. It was also shown that the engineer and fireman backing in around the curve could not see Nichols or plaintiff, but could at all times see one of the switchmen. The only evidence, as to where the switchmen were, was that of defendant's switch foreman, who testified that switch engine and cars, which backed into track 13, pulled from

track 34, west of track 13, to the main lead and backed from the lead, onto track 13, with the engine on the north. He said he remained on the lead track about two car-lengths from track 13, and could only see part of the way down the east side of the cars there. As far as he could see on the east of track 13 there were no men in sight. He said there were two switchmen with the cars. This witness testified that one of them came across from track 34 and lined up for 13, but that he did not think he had to throw the switch, and that he was the man working to the rear end of the string of cars. His position as the cars were backed in was not shown. The other switchmen was lining cars or switch coming out of 34, but that he was north of the engine when it backed into track 13 and could not see on 13. He also testified that if a man on track 13 gave a stop signal he would have stopped, but that he had never been instructed to, and knew of no custom to, look out for any signal other than from his own switch crew.

Plaintiff, in his petition, alleged several assignments of negligence, but abandoned all of them except the following assignment upon which he submitted the case:

"That said defendant was further careless and negligent in that plaintiff's co-worker or buddy, who was standing near when plaintiff was performing his duties and in a place where he could see the approach of any car or cars failed and neglected to warn plaintiff of the danger and approach of said cars in time to avoid his injury, as had been the custom and practice in said yards for such helper to warn plaintiff when he was in a place of danger doing light repair work."

Defendant's answer alleged the Blue Flag rule and that plaintiff violated the rule and alleged that in doing so plaintiff assumed the risk and was guilty of negligence, and that his injury was the direct result of his violation of the rule. Plaintiff's reply alleged the custom not to place a blue flag at the north end of cars on the tracks where plaintiff was working was established, known and acquiesced in by defendant. It also alleged that defendant's foreman notified plaintiff at the time he went to work at Rosedale not to use a blue flag at the north end and instructed plaintiff that he and his co-employees would have to look out for and warn each other.

Plaintiff filed an additional abstract of the record only six days prior to the day this cause was set for hearing. Defendant has filed a motion to strike this additional abstract from the record because it was neither filed nor served fifteen days prior to that time, as required by Rule 11 of this court. The filing of an additional abstract, after the time allowed, is within the discretion of this court. [Berry v. St. Louis & San Francisco Ry. Co., 26 S. W. (2d) 988.] Appellant makes

no claim that anything shown in the additional abstract is incorrect and makes the following admission in its reply brief:

"It is true that all of the cars then on track 13 had been placed there by the Union Pacific and that they had crossed the state line in the course of such delivery."

This is the principal fact sought to be shown by the additional abstract, and this appears from other evidence. The other matters contained therein can have no effect on the merits of the case. Therefore, the motion to strike out the additional abstract is overruled.

The defendant contends that the plaintiff was not shown to have been engaged in interstate commerce, and that the court therefore should have sustained its demurrer to the evidence. Defendant says that it is not shown whether or not the particular car, upon which plaintiff was working when injured, was loaded or empty, where it came from, or where it was to go, and that whether or not he was engaged in interstate commerce must be determined by the particular car upon which he was working. Our view is, however, that the evidence clearly shows that plaintiff was engaged in interstate commerce. The cars on track 13 at the time plaintiff was injured had been delivered to defendant by the Union Pacific Railway Company. Even though we disregard the fact that in making the delivery they had been all brought together from Missouri into Kansas, the evidence on the part of both plaintiff and defendant shows that this string of cars was being handled as a unit; that it contained cars destined to points in other states; and that none of the cars whether loaded or empty were to remain on track 13 any longer than the time required to inspect them in accepting from the Union Pacific. Track 13 was used only for receiving such deliveries, and immediately upon the completion of the inspection, oiling and light repairs, the cars were to be uncoupled from the string and put in southbound interstate trains, taken to the local industries to which they were destined, or if empty and not to be used for either of these purposes, taken to storage or repair tracks. The work in which plaintiff was engaged was inspecting, working upon and oiling indiscriminately the whole string of cars, whether interstate or intrastate, loaded or empty, in good or bad order, and, under former decisions, he was unquestionably engaged in interstate commerce. [Poindexter v. C. C. C. & St. Louis Ry. Co., 319 Mo. 285, 4 S. W. (2d) 1065; St. Louis & San Francisco Ry. Co. v. Seale, 229 U. S. 156, 33 S. Ct. 651, 57 L. Ed. 1129, Ann. Case 1914C, 156; North Carolina Railroad Co. v. Zachary, 232 U. S. 249, 34 S. Ct. 305, 58 L. Ed. 591, Ann. Case. 1914C, 159; Erie Railroad Co. v. Winfield, 244 U. S. 170, 37 S. Ct. 556, 61 L. Ed. 1057, Ann. Case 1918B, 662; Baltimore & Ohio Railroad Co. v. Flechtner, 300 Fed. 318; Davis v. Dowling, 284 Fed. 670; John-

son v. Great Northern Ry. Co., 178 Fed. 647; Kepner v. C. C. C. & St. Louis Ry. Co., 15 S. W. (2d) 827.; Stottle v. C. R. I. & P. Ry. Co., 18 S. W. (2d) 433.] The trial court, therefore, properly overruled defendant's demurrer to the evidence.

Defendant's next contention, that the court erred in giving plaintiff's Instruction No. 2, presents a more serious question. This instruction is divided into three propositions. The first part instructed the jury that if defendant permitted plaintiff and other employees to work under cars in its Rosedale yards, without placing a blue flag at the north end, and that, on account thereof, the place, where plaintiff was required to work, was not reasonably ·safe, then defendant owed plaintiff the duty to use ordinary care to make such place reasonably safe and protect him against incoming cars. The second part of the instruction instructed the jury that if they found either that defendant's foreman instructed plaintiff not to use a blue flag at the north end of cars, and told him that he and his buddy were to watch out for each other for cars coming from the north, and that this was the practice in the yards, *or* if they found that such a custom had arisen, which was known and acquiesced in by defendant, and that when plaintiff went under the car his buddy, Nichols, knew it and promised to look out for him and was in a position where he could see cars coming, on track 13 from the north, in time to advise plaintiff thereof, that plaintiff had a right to rely upon such method of protection while under the car. The third part of the instruction then continues:

''And if you further find and believe from the evidence that, while plaintiff was so . situated under said car, the agents, servants and employees of the defendant switched certain other cars in upon track 13, and moved the car under which plaintiff was working, and plaintiff was thereby injured, and *that the said Nichols knew, or by the exercise of ordinary care could have known, that said car or cars were coming in on track* 13, at the north end, and were about to collide and strike the cut of cars under which plaintiff was working, *in time to have thereafter signaled the switchmen moving said cars,* (*or*) in time to have thereafter warned and notified the plaintiff of the approach thereof in time for plaintiff to get out of danger, and thereby said injury to plaintiff could have been avoided, *and that the said Nichols failed to do so, when by the exercise of ordinary care he could have done so and thereby avoided plaintiff's injury,* then you are instructed that the defendant was guilty of negligence; and if you further find that plaintiff's injuries were proximately caused, in whole or in part, by such negligence, if any, then your finding and verdict should be for the plaintiff.'' (Italics and parenthesis ours.)

It is, therefore, apparent that this instruction not only submitted a charge of negligence which was not pleaded, namely, the failure of Nichols, if he knew, or by the exercise of ordinary care could have known, that the cars were coming on track 13 in time to do so, to signal the switchmen moving such cars when by the exercise of ordinary care he could have done so and thereby avoided plaintiff's injury; but it also submitted this charge without any evidence upon which to base it or upon which it could be sustained. This, under the authorities, is erroneous. [Kitchen v. Schlueter Mfg. Co., 323 Mo. 1179, 1193, 20 S. W. (2d) 676, 682; Talbert v. C. R. I. & P. Ry. Co., 314 Mo. 352, 368, 284 S. W. 499, 503; Kuhlman v. Water, Light & Transit Co., 307 Mo. 607, 635, 271 S. W. 788, 797; State ex rel. Central Coal & Coke Co. v. Ellison, 270 Mo. 645, 652, 195 S. W. 722, 723; State ex rel. National Newspapers Assn. v. Ellison, 176 S. W. 11, 13; Degonia v. St. Louis, I. M. & S. Ry. Co., 224 Mo. 564, 588, 123 S. W. 807, 816.] These decisions, as well as the earlier cases, were reviewed in Kitchen v. Schleuter Mfg. Company, supra, and it was there held upon the authority of State ex rel. Central Coal & Coke Co. v. Ellison, supra, that it was erroneous to broaden the issues by an instruction, even though evidence upon such issue was allowed to go in without objection.

Defendant, here, allowed plaintiff to testify without objection that the custom of watching for each other for cars included, on some occasions, signaling switchmen to stop them, instead of warning the man under the car to get out; cross-examined plaintiff as to the custom of signaling the switchmen; and introduced evidence on the part of the defendant controverting plaintiff's evidence of the custom. But the fact that it was shown that the custom of the men protecting each other from moving cars, by one keeping a watch while the other worked, included, under certain circumstances, signaling switchmen, bringing in cars, to stop, does not justify the submission of the issue of whether in this instance Nichols knew, or by the exercise of ordinary care could have known, the cars were coming in time to have signaled the switchmen and thereby avoided plaintiff's injury, when there was neither pleading nor proof that the switchmen were where they could have seen any signal Nichols could have given. Furthermore, even though we might believe that one of the switchmen could have seen Nichols signal, whether he, in turn, could have signaled the engineer in time for him to stop the train, before it struck the cars under which plaintiff was working, would still be left to speculation and conjecture. Since this instruction permitted the jury to find a verdict upon a ground of negligence not pleaded and of which there was no proof, the judgment cannot stand. The other matters complained of will probably not occur at another trial.

The judgment is reversed and the cause remanded. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.