BERNARD PEVESDORF v. UNION ELECTRIC LIGHT & POWER COMPANY, Appellant.—64 S. W. (2d) 939.

Division One, October 19, 1933.

*Theodore Rassieur, George M. Rassieur* and *John P. McCammon, Jr.,* for appellant.

*Foristel, Mudd, Blair & Habenicht* for respondent.

1160

HYDE, C.—This is an action for damages for injuries, alleged to have resulted from carbon monoxide gas poisoning, while plaintiff was employed in defendant's garage. Plaintiff's petition charged failure to furnish plaintiff a safe place of work in the following respects: That defendant negligently allowed the engines of automobiles to be run in the garage so as to permeate it with carbon monoxide gas due to lack of ventilation facilities; that it negligently assured plaintiff he could work there in safety when it knew, or, by the exercise of ordinary care, could have known that it was dangerous; and that it failed to ventilate the garage so as to render harmless all impurities as near as may be. The charge of negligence (pleaded and submitted) was more specifically stated as follows:

"That said garage was operated and maintained by defendant without defendant providing and maintaining open outlets to the outside air and without providing an exhaust fan or other means of ventilation so that fresh air would enter and stale air and gases go out of said garage, by reason whereof noxious fumes containing carbon monoxide gas, which were emitted from said automobiles, collected and accumulated in said garage and permeated the atmosphere thereof, and thus rendered said place injurious to the health and life of employees engaged in work there."

Defendant's answer was a general denial and a plea of release. Plaintiff's reply alleged that the release was never delivered. Plaintiff obtained a verdict for $50,000. Thereafter, a *remittitur* of $20,000 was ordered and made and from the new judgment entered for $30,000 defendant has appealed. Defendant contends that its demurrer to the evidence should have been sustained, so it is necessary to review all of the evidence.

Plaintiff's evidence was that he commenced to work in defendant's garage in 1916; that he was then in good health, worked steadily and was never bothered by any kind of fainting spells or peculiar feelings. He had evidence that there was no suction fan ventilating system in the garage; that about seventy or eighty automobiles were kept there, most of them being large trucks; and that the motors of these trucks were started in the garage and were allowed to run while they were warming up. Motors were also run at "other times throughout the day when trucks were brought in or taken out and when they were tuned up or repair work done on them." The result was said to be (1918 to 1921) that "when automobiles were started up there in the morning the place would get real cloudy like, foggy or smoky; sometimes it was so cloudy or dense in there you could not see five feet away from you;" that the men complained about this condition; that it caused them to have sick headaches; and that they would be made nervous and go to bed without eating supper. One former foreman suggested to his superior that it was necessary to have "a suction type system that would take the foul air away

from the floor and put it out near the roof of the building" and that in such a system "the fan would be high and the suction pipes would be near the floor to pull out the foul air." His evidence was that monoxide gas "hugs the floor within six or eight inches above the floor; as it loads up it will rise." He also complained to his superior "that it was making me and the other men there sick." It was also shown that a former employee, Joe Hinn, was overcome by carbon monoxide gas in the garage in December, 1919, while working underneath an automobile which was not running. Hinn afterwards had convulsions. Appellant had as an expert a chemist, who said that "the exhaust gas from a gasoline propelled motor contains a mixture of water vapor, some carbon monoxide, some carbon dioxide, nitrogen, a little oxygen, and some unburned hydrocarbon material in the form of vapor; that "the mixture as it comes into the atmosphere is heavier than the atmosphere;" that "it has a tendency to stay where it is or fall slightly unless some current of air causes it to rise;" that "it takes force to move it;" and that "the most efficient method of removal of a heavy fume," he included "carbon monoxide and fumes obnoxious to health," was "some sort of suction or ventilation near the floor;" but said, "you could remove it by a powerful draft in any part of the room, that is, you could ameliorate, but it would be necessary to have a more powerful ventilating apparatus to—many times more powerful than by a draft—if down close to the floor that will take that away without necessarily removing the whole roomful of air." He said, however, he had not observed "the ordinary methods for removing fumes prior to 1923" in garages.

Plaintiff said that on March 2, 1923, he was overcome by gas in the center of the garage after working about an hour tuning up quite a few cars; that "the atmosphere in the garage was real smoky at the time;" that he was taken home and to his family doctor; and that he did not go back to work for four or five days. Plaintiff further said that, prior to that time, he had made complaints about automobile exhaust fumes in the garage; that he made suggestions to his superior about wanting a ventilating system put in; that he would open doors and windows in the garage for ventilation and that his foreman would close them. Plaintiff was a member of the safety council of defendant's employees and he said he was acting in that capacity in attempting to keep doors and windows open for ventilation. Plaintiff also testified to two occasions when the hood of a truck fell and hit him on the head while he was working on a motor, which left him with a headache condition the rest of the day; but each time he continued to work the rest of the day. He also said that once while working on a tail gate of a truck another truck backed into it and pressed him against the wall. According to his testimony, however, these incidents took place after he had been overcome by

gas on March 2, 1923. Plaintiff continued to work for defendant until 1927, but after March, 1923, he had other fainting spells which became more frequent until "he has them sometimes every day, sometimes every two days, sometimes two or three a day."

Plaintiff's petition pleaded, and defendant admitted at the trial, that his trouble was epilepsy. To show that this resulted from carbon monoxide gas poisoning, plaintiff had considerable expert medical testimony. By this testimony, it was shown that carbon monoxide, by reason of much greater affinity for the hemoglobin in the blood, displaces the oxygen therein and thereby deprives the brain of oxygen; that "the patient usually becomes dizzy, has shortness of breath, or breathes more deeply and may have a condition of chilly sensation, pallor, or if it comes on slowly enough, this cherry red color of the skin that is often spoken of. He may be nauseated, vomiting and unconsciousness," and that "the first effects are primarily not in the brain but in the blood vessels to the brain. There is a swelling, breaking down of the tiny veins and capillaries and that in turn causes nerve tissue damage." It was also said that this may result in a destruction of nerve tissue in the brain and produce a lesion and that such a lesion will cause what is known as *organic epilepsy,* which is epilepsy produced by "an organic lesion of the brain." It was also shown that blows upon the head which would injure the brain could also produce a brain lesion which might result in epilepsy (which would also be organic). The testimony of plaintiff's doctors was that epilepsy which did not result from a brain lesion was known as *idiopathic epilepsy* which includes hereditary epilepsy and all unknown causes thereof (as distinguished from discoverable organic causes). These experts examined plaintiff by testing his reflexes and making vibratory and other tests. From such examinations, they stated that they believed he had a brain lesion (one said a spinal cord lesion) such as could result from the effects of carbon monoxide gas and therefore that he suffered from the organic type of epilepsy. The following excerpts from the evidence show the substance of their testimony:

DR. LEE D. CADY:

"Q. This evidence of lesion which you found by the abnormal reflexes, has that led you to believe there is something wrong with Pevesdorf's brain? A. Yes, sir. Q. Has it led you to believe he as a lesion in the brain? A. Yes, on the right side of the brain. Q. Such a lesion, could it follow the effects of the inhalation of carbon monoxide gas? A. It could. . . ."

DR. WALTER SEIBERT:

"Q. The result of your examination, so far as you have already testified, did they indicate anything to you with reference to Pevesdorf suffering from any brain condition? A. Yes, sir. Q. What did it indicate? A. That there was a wide-spread lesion in the

brain, involving the cortex of the brain over a widespread area. Q. When you speak of a lesion in the brain, what do you mean by it, doctor? A. Lesion in the brain as the result of an injury to the brain, which results in degeneration. Q. Is a lesion of the brain an abnormal or normal condition? A. Abnormal condition. Q. Can it produce pressure, or does it produce pressure? A. It may produce pressure. Q. May it produce convulsions? A. Yes, sir. Q. May it produce epilepsy? A. Yes, sir. Q. What is epilepsy? A. Epilepsy is a chronic disease of the brain in which there are convulsions.''

After describing the effects of carbon monoxide gas has been found to produce in the brain of one overcome by it and exhibiting a section of the brain of a man who died from carbon monoxide exposure Dr. Seibert said:

''It is my opinion that this man (plaintiff) does have changes such as these in his brain.'' (Referring to those pointed out in the brain exhibited.) His testimony continued: ''Q. Are you able to tell what part of his brain, from the examination that you made, what part of Pevesdorf's brain is affected from the carbon monoxide gas? A. Yes, I think there is a wide-spread cortical degeneration. Q. That is a permanent condition? A. Yes, sir. Q. Would such a condition, doctor, produce epilepsy? A. It may. . . .''

Dr. James F. McFadden:

''Q. Does hemorrhage of the brain ever follow the effects of inhalation of carbon monoxide gas? A. They are very small hemorrhages to the small blood vessels that supply the brain cells. Q. Those are referred to as petechial hemorrhages? A. Yes, sir. Q. That means that the blood leaves the regular blood stream, penetrates the blood vessels, and runs out in the brain? A. It means it breaks away from the regular stream out to the parts adjoining that blood vessel. . . . Q. Does it ever produce scar tissue? A. Surely it does. Q. Is that an abnormal condition in the brain? A. Yes, sir. Q. Doctor, a person who suffers from scar tissue in the brain, would you say that he suffers from abnormal pressure on the brain? A. He may or may not. Q. That is intercranial pressure? A. Yes, sir. Q. Does this degeneration of nerve cell and nerve nucleus and brain tissue ever cause convulsions? A. It can and it does in some cases. Q. And what is epilepsy? A. The real definition of epilepsy is a long or short period of unconsciousness coming on suddenly and in which we usually see convulsions. Q. Doctor, these abnormal reflexes that you saw in Pevesdorf, in July, that you testified that—I think you did testify that they indicated to you that this patient had definite organic changes within the brain? A. Yes, sir. Q. Such changes as that, definite organic changes within the brain, could that follow from the effects of the inhalation

of carbon monoxide gas? A. It could. Q. If it did, would it produce those abnormal reflexes that you found? A. It would."

It was shown by plaintiff's mother and brother that when he was brought home in March, 1923, after his alleged gas attack that his face was red and swollen; that he was in a dazed condition; that he had never had such spells before; and that he had many fainting spells thereafter which gradually became more frequent. Dr. McFadden gave as his opinion that from his findings, and from the history of the case stated to him, that in the absence of the knowledge that blows sustained by plaintiff "had caused any brain damage . . . I would feel that that man's condition, as I stated in my report, was due to the fact that he had been overcome by carbon monoxide." He said that an epileptic condition could result from blows upon the head severe enough to cause brain injury, but explained his opinion that the injury to plaintiff's brain, which he believed from his examination existed, was caused by carbon monoxide poisoning rather than from any injuries by blows upon the head, as follows:

"Q. Was there anything from the examination that you made that enables you to differentiate between the brain lesion caused by carbon monoxide poisoning and a trauma? A. Yes. Q. What was it? A. It was signs of a diffuse lesion, and in trauma we find focal lesions, lesions in particular parts—that is, isolated; not as diffuse and spread out as these findings."

He also testified that there was evidence of a spinal cord lesion upon which he also partly based his belief that the gas caused plaintiff's condition, as follows:

"Q. Doctor, before you go into this other matter, the result of this vibratory test such as you made and found on January 15, 1930, could you tell from the results obtained whether the lesion to the cord, the spinal cord, was the effect of trauma or carbon monoxide gas? A. This vibratory sense shows definitely to me that there was a lesion in the spinal cord, in the back part, the fibers that go up and carry sensation to the brain. Now, whether it was caused by trauma, if it had been caused by trauma it would have been an entirely different picture. Q. In what way? A. The amount of trauma that would have been sufficient to cause that change would have caused grave changes in the cord, severe changes and paralysis, what we call myelitis, or inflammation of the cord. Trauma that could pick out that particular fiber pathway. Q. You were satisfied obtained from the vibratory test that the lesions in the cord were not produced by trauma, were you? A. I was satisfied to that effect."

Defendant's testimony showed that the main room of the garage was 152 feet long and sixty-six feet wide with a ceiling thirty-five feet high. At the south end, there was a double door, with a 10x10 opening and two double windows 8x10. At the north end, there were

double sliding doors 13x13 and also two double windows. There were three tilting windows three and one-half to four feet square above the south door and one similar round window above the north door. Defendant's witnesses said that these windows were kept open at all times and that it was part of plaintiff's duty as a safety man to see that they were open. In the east wall there was one big sliding door similar to one of the front doors and one smaller door. On the west side of the building was a storage room 45x66 with a 10x10 opening and the lavatory and a locker room. Defendant's witnesses also testified that, from 1917 to 1923, there was a suction fan in the wall of the south end of the large garage room. They said that this fan would take out the heat as well as the foul air, made the garage cold, and that the men complained about that. For this reason, it was changed in the fall of 1923 by installing twelve suction vents near the floor (ten in the west wall and two in the south wall) so that the suction fan would take the air away from the floor without lowering the heat of the room. A similar type of fan was used in both the old and new ventilating systems. These witnesses also said that, since the garage was steam heated, it was not necessary to run motors to warm them up and that this was not done.

On behalf of defendant, there was also testimony that plaintiff's first fainting spell occurred May 8, 1923. This was stated by Evans, the man plaintiff said took him home after his first attack, and by other men who were at the garage at the time. Their evidence was that plaintiff fainted in the lavatory, which was separated from the garage by fire doors, and not in the part of the garage where the trucks were kept. Their evidence also was to the effect that the weather was warm; that all of the doors were open at the time; and that plaintiff had just returned from a trouble call and had not worked on any trucks before he went into the lavatory. Plaintiff was corroborated as to the time of his first attack by his family physician, Dr. Eyerman, who was called as a witness by defendant. He testified from his records that plaintiff was brought to his office on March 2, 1923, by his father and that he was told at that time that he had been overcome at his work by automobile gas. Dr. Eyerman treated him a number of times in March and April for similar attacks, which he diagnosed as epilepsy, all of which were prior to the time in May which, according to defendant's testimony, was the first fainting spell plaintiff had at the garage. Dr. Eyerman also testified that he was informed by plaintiff of the times he had received blows upon the head at the garage, and he attributed plaintiff's epilepsy to brain injury caused by these blows.

Defendant had considerable expert medical testimony upon the subject of epilepsy and carbon monoxide gas poisoning. According to this testimony, there was no causal connection between carbon monoxide gas exposure and epilepsy. According to the testimony

of these doctors, "carbon monoxide either kills you or you get well." They testified that the symptoms of being overcome by carbon monoxide are very different from an attack of epilepsy; that in the former "there is no tonsisty of the muscles" but that the patient wilts like a wet rag, whereas in an epileptic attack "the patient falls suddenly, has chronic contractions, his muscles become rigid and shake. He will froth at the mouth, bite his tongue, will be gasping for air, and suddenly will relax and come to exhausted." In an epileptic attack the face will be pale while if overcome by monoxide gas it will be red and swollen. They said that epilepsy was usually hereditary, but that it could be caused by a blow on the head which would cause a brain lesion or that hereditary epilepsy could be aggravated by such a blow. They also said that prior to the final stage, in which the attacks were called *grand mal* seizures, the patient frequently had what were called *petit mal* seizures, in which "for a second he will stop and then will be in a state of rigidity or stare at you and then continue with the conversation where he left off. He won't be unconscious. He will just be in a stationary position." Defendant had the testimony of plaintiff's fellow workers that prior to his severe attacks in 1923 he would momentarily stand and stare at them or grab them or grab at nearby objects. According to the doctors, these were symptoms of hereditary epilepsy which would gradually grow worse. Their testimony was also that in plaintiff's first attack he was pale and became rigid. Such other portions of the great mass of testimony in this case as we consider pertinent will be hereinafter mentioned in the opinion.

Appellant contends that its demurrer to the evidence should have been sustained. It contends both, that the evidence fails to show negligence on the part of defendant in the ventilation of the garage, and also that it fails to show any causal connection between the accumulation of carbon monoxide gas in the garage and plaintiff's epileptic condition. As to the first proposition, proof of negligence in ventilation, defendant says there is a failure of proof "(1) that defendant's garage was not properly ventilated at the time plaintiff fainted, (2) that the ventilation facilities provided were inadequate, (3) that the doors and windows were not open, and (4) that there was an accumulation of carbon monoxide gas." We think that plaintiff had sufficient evidence to require submission to the jury of the issue of negligence in providing ventilation. It seems that this matter was rather lost sight of as the trial progressed since by far the greater part of the evidence was directed to the question of causal connection between carbon monoxide gas poisoning and plaintiff's subsequent condition, and the controversy over the release. There are not many negligent ventilation cases in the books, except cases of ventilation of mines, where the situation is necessarily much different, the work being underground with little possibility of natural ventila-

tion, and the matter is largely governed by statutory requirements because of the very hazardous nature of the work. Most carbon monoxide cases have been under Workmen's Compensation acts or were insurance cases. These are not helpful here because they do not involve negligence. Negligence in ventilation was very thoroughly considered and discussed by the United States Circuit Court of Appeals, Third Circuit, in Pennsylvania Pulverizing Company v. Butler, 61 Fed. (2d) 311, and the evidence there held insufficient to make a case. For cases where evidence of negligence in providing ventilation was held sufficient, to make a submissible case, see Brennecke v. Ganahl Lumber Co., 329 Mo. 341, 44 S. W. (2d) 627; Zielsdorf v. Grotsky (Wis.), 218 N. W. 186; Anderson v. Atlantic City Gas Co. (N. J.), 145 Atl. 238 (illuminating gas); Olchefsky v. Mercier, Bryant, Larkins Brick Co. (Mich.), 215 N. W. 317. In the Pennsylvania Pulverizing Company case the court pointed out that in the matter of ventilation the master's duty to his servant is the same as in furnishing machines or appliances with which to work or providing for the safety of the place of work in any other respect, namely: The employer is required only to use reasonable care in selecting instrumentalities for his protection, the employer is not an insurer, and the duty imposed upon him is not to furnish the safest or newest and best machines and appliances, but only to exercise due care to provide those which are reasonably free from danger. The test of this is the usage of the business, namely, what is in common and ordinary use in similar establishments.

In the Pennsylvania Pulverizing Company case, there was much uncontradicted evidence to show that the defendant had with great care and much study of other establishments provided an efficient ventilating system. Here, there was no direct evidence on either side as to what means of ventilation was in common and ordinary use in similar garages, at the time plaintiff claims to have been overcome. Plaintiff did, however, have expert testimony as to the nature of carbon monoxide gas showing that it was likely to remain near the floor unless some current of air causes it to rise and that "it takes force to move it." Plaintiff also had evidence to the effect that the garage was often smoky from motor exhaust gas and evidence of what elements such exhaust gas contained. It is reasonably inferable from this evidence that there would be carbon monoxide in injurious quantities wherever there was a great amount of this smoky exhaust and that it would be more injurious near the floor. It was shown too, that at least one other employee had been overcome by carbon monoxide gas while working on the floor of the garage. It is also true here, which was not true as to the making of dust commented upon in the Pennsylvania Pulverizing case, that part of plaintiff's charge was that there was an unnecessary amount of ex-

haust gas emitted in the garage by reason of negligently and unnecessarily running the motors of automobiles therein and there was some evidence to sustain this although it was disputed.

Plaintiff's evidence does not seem substantial enough to show that natural ventilation would be insufficient if properly used, in warm weather when all doors and windows could be opened, that is, that a natural draft could not be created through the windows and doors sufficient to move out or render harmless the exhaust gas. However, ordinary care requires not only sufficient means of ventilation but a sufficient use of such means. There is evidence on the part of plaintiff to show that the windows and doors were not kept open in cold weather, but that when plaintiff would open them they would be closed by others, and that plaintiff complained about it. Plaintiff's evidence was that he was overcome early in March, a time of the year when doors could not be kept open at least as frequently as in May, the time fixed by defendant. While defendant's evidence was that there was also a suction fan, this was disputed by plaintiff's evidence. Of course, even upon defendant's theory that open doors would create sufficient ventilation, plaintiff's testimony that it was real smoky where he was overcome in the center of the garage while tuning up motors, is some evidence that all doors and windows were not open and, therefore, of insufficient ventilation at that time for the amount of motor exhaust gas emitted. The evidence of other former workmen called by plaintiff as to the usual condition over a considerable period of time (two or three years) when provisions for ventilation and methods of using them apparently were the same as in March, 1923, also shows facts from which, in the absence of positive testimony to the contrary as to conditions on the day plaintiff was overcome and in light of plaintiff's testimony as to what they were on that date, it may be reasonably inferred that ordinary care was not being used to ventilate the garage, as well as it should have been, that day and that there was then a dangerous accumulation of carbon monoxide gas. ■ Considering all of this testimony in the light most favorable to plaintiff and drawing all reasonable inferences which might be drawn therefrom, as we must do in passing upon a demurrer to the evidence, we hold that plaintiff's evidence was sufficient to justify submission to the jury of the issue of the negligence charged.

■ Neither do we think that the further contention of defendant upon the demurrer can be sustained, namely: That there was no substantial evidence to show a causal connection between plaintiff's epileptic condition and his alleged attack from carbon monoxide gas. While it is true that most of the evidence of plaintiff's doctors only amounted to testimony that it was scientifically possible for carbon monoxide to produce such a result (and that was that most of defendant's expert testimony disputed) yet Dr. McFadden did state

that it was his opinion that carbon monoxide exposure did cause it. Defendant says, however, that this statement is without probative value because Dr. McFadden based it upon the absence of knowledge of any blows upon the head sufficient to cause brain damage. Defendant says that Dr. McFadden eliminated from consideration one of the probable causes shown by the evidence and that because he did so his opinion is valueless, citing DeDonato v. Wells, 328 Mo. 448, 41 S. W. (2d) 184, in which this court held that it was improper, in asking an expert witness a hypothetical question, to direct him to eliminate all other causes except that which was plaintiff's theory of the cause. Defendant says that, whether other causes are eliminated by counsel in asking a question or by the witness in answering the question, the result is the same. However, in the De-Donato case the question was improper because "it restricted and limited the witness in taking into consideration all his knowledge." The court said:

"The chief value of expert evidence lies in the fact that the witness possesses superior knowledge of the subject under consideration, and by reason of his study, training, and experience he is able to discern and trace the causal connection, if any, between successive events, and can aid the jury in determining whether the claimed injury is the result of the alleged cause or may have a different cause. Certainly the witness should be left free in the exercise of all his faculties in so doing, and should not be told to exclude matters which may be important."

In this case Dr. McFadden was not limited to the consideration of any one cause and did not arbitrarily himself exclude any possible cause. After stating his opinion that carbon monoxide was the cause he went further and explained why he considered it the cause rather than blows or any other possible cause, namely, a condition of plaintiff's brain, as indicated by the reflexes and other symptoms, which he said was more wide-spread than would be caused by blows and could be explained under the known facts only upon the theory of carbon monoxide exposure. Furthermore, Dr. Seibert stated his opinion to be that plaintiff had changes in his brain such as he had found in the brains of known carbon monoxide victims. Of course, it was for the jury to decide whether to believe this testimony or the defendant's evidence sharply controverting it. Moreover, if plaintiff's evidence was to be believed, there were the additional circumstances of numerous epileptic attacks immediately following plaintiff's exposure and collapse in the garage. We hold that there was sufficient evidence of causal connection to warrant the submission of that issue to the jury. [See O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55; Cropper v. Titanium Pigment Co., 47 Fed. 1038, 78 A. L. R. 737, note 78 A. L. R. 755; 4 Wigmore on Evidence,

1170

198, sec. 1976.] The demurrer to the evidence was therefore properly overruled.

■ Defendant also assigns as error giving plaintiff's Instruction No. 3, which was the main instruction covering the case and authorizing a. verdict. This instruction first stated that if defendant employed plaintiff in its garage that its duty was "to exercise ordinary care to make and keep said garage reasonably safe as a place of work for plaintiff." It then hypothesized the facts upon which a recovery by plaintiff was authorized as follows:

"If, therefore, you find from the evidence that the starting and use of said automobiles in said garage caused carbon monoxide gas to be generated. and emitted from the exhaust pipes thereof, and that said gas was dangerous and, when accumulated in sufficient quantity would be likely to injure persons therein, and that said gas was produced and emitted there by said automobiles in such quantities that *unless dissipated or removed by ventilation, or in some manner, the same would* accumulate sufficiently to *be harmful* and dangerous to employees and that it would be likely to cause employees to be injured, and that *defendant knew,* or by the exercise of ordinary care would have known thereof, and of the said danger of injury thereby *in time,* thereafter by the exercise of ordinary care *to have remedied said condition* so as to cause the said place to be reasonably safe as a place of work and avoided injury to the plaintiff, if you find he was injured; and then if you further find *that it was reasonably practicable for defendant to have prevented the accumulation of such gas* in such quantities *and* that by the exercise of ordinary care defendant *could and would have done so,* and if you further find from the evidence that on or about the 2nd day of March, 1923, the plaintiff, while in said garage and in the discharge of his duties there as an employee of defendant (if you so find), sustained an attack of carbon monoxide gas and was injured thereby, and that said attack and injury was caused by an accumulation therein of said carbon monoxide gas so emitted from said automobiles, and that it had accumulated there at that time in such quantities as to be not reasonably safe to persons therein and so as to be likely to cause them to be injured thereby, as aforesaid, and be dangerous, and if you further find from the evidence that the accumulation of said gas on said occasion and the injury of plaintiff thereby, as aforesaid, directly and proximately resulted from negligence of defendant *in failing to exercise ordinary care to have said place reasonably safe,* if you so find."

In addition to this, it required the jury to find that plaintiff did not deliver the release and was not barred by the Statute of Limitations. It is apparent that this instruction loses sight of the specific negligence charged in plaintiff's petition, namely, failure to exercise ordinary care to *provide and use sufficient means of ventilation* to get

fresh air into the garage, and prevent the accumulation of carbon monoxide gas in dangerous or injurious quantities therein, by sufficient ventilation. It nowhere either limits the jury to finding for plaintiff on the theory that the facilities for ventilation in the garage were insufficient, or that there was negligence in failing to make use of such means as existed, or requires a finding of what kind of method or system would be required by the exercise of due care to prevent the accumulation of such gas. Its essential requirements merely are: That automobile exhaust gas was dangerous; that gas was produced in the garage in such quantities as to be dangerous if allowed to accumulate and was not "dissipated or removed by ventilation *or in some manner;*" that defendant knew or by the exercise of ordinary care could have known these facts (it is such common knowledge that exhaust gas is dangerous if allowed to accumulate sufficiently that no one would question them) in time "by the exercise of ordinary care *to have remedied said condition*" (does not say by ventilation) and make the place reasonably safe; that it was "*reasonably practicable* for defendant to have prevented" accumulation of gas in injurious quantities and "could and would have done so" by the exercise of ordinary care (again fails to say by ventilation); that plaintiff was injured by a carbon monoxide gas attack caused by accumulation of such gas in injurious quantities in the garage; and that accumulation of gas and plaintiff's injury thereby "directly and proximately resulted from negligence of defendant in failing to exercise ordinary care to have said place reasonably safe (again omitting all reference to ventilation). This amounted to no more than the general direction with which it commenced, that defendant's duty was "to exercise ordinary care to make and keep the garage reasonably safe as a place of work for plaintiff," and left the jury without reference to the negligence specified to speculate upon how this was to be done.

The petition charged both failure to provide open outlets to the outside air (open windows and doors?) and failure to maintain such outlets (keep windows and doors open?). It did not charge that there were insufficient windows and doors to prevent an injurious accumulation of gas if they were kept open. It also charged failure to provide "an exhaust fan or other means of ventilation," but did not allege that the garage could not be ventilated without such fan or other means or that such a fan was a usual, customary or necessary means for ventilation of garages, and of the latter, at least, there was no evidence. The instruction ignores what the petition alleges was negligence and, in substance, only requires the jury to find that the gas from defendant's trucks was dangerous "*unless dissipated or removed* by ventilation or *in some manner;*" that defendant knew or should have known of this danger in time "*to have* remedied said condition" (by ventilation or in some manner?) so as to make the place reasonably safe; that "*it was reasonably prac-*

*ticable* for defendant to have prevented the accumulation of such gas'' (again by ventilation or in some manner, no other limitation being stated); and that plaintiff was injured by an accumulation of gas ."directly and proximately resulting from negligence of defendant *in failing* to exercise ordinary care *to have said place reasonably safe* (likewise by ventilation or in some manner). Therefore, it will be seen that this instruction broadens the issue made by the petition, of failure to furnish a safe place to work by reason of not providing and maintaining sufficient ventilation by outside openings or an exhaust fan to prevent a dangerous accumulation of gas, and submits failure to furnish a safe place to work not only by reason of failing to provide sufficient ventilation to prevent such accumulation of gas, but also failure to furnish such a safe place by reason of failing to prevent it in any other manner the jury might construct or evolve in their own minds for remedying or preventing the accumulation of exhaust gas. It thus gives the jury a roving commission to find for plaintiff if they thought there was any reasonably practicable way to have prevented or remedied the situation. This, under all the authorities, is reversible error. [Degonia v. St. L., I. M. & S. Ry. Co., 224 Mo. 564, 123 S. W. 807; State ex rel. Central Coal & Coke Co. v. Ellison, 270 Mo. 645, 195 S. W. 722; Kuhlman v. Water, Light & Transit Co., 307 Mo. 607, 271 S. W. 788; Kitchen v. Schlueter Mfg. Co., 323 Mo. 1179, 20 S. W. (2d) 676; Gandy v. St. L. & S. F. Ry. Co., 329 Mo. 459, 44 S. W. (2d) 634.]

Plaintiff says:. "The petition charges negligent failure to get 'stale air and gases' out of the garage and let fresh air enter in its place. Any means whatever which will accomplish that, in any case, results in ventilation. . . . The words 'in some manner' cannot add other means of getting foul air out and fresh air in, because there are no such other means." The trouble with the instruction is, however, that it does not limit negligence which the jury is authorized to find to insufficient means or insufficient use of means of getting out gas and letting in fresh air. It makes that (ventilation) only one thing to be considered by them and allows them to consider whether gas could be "dissipated or removed by ventilation or in some manner" (defendant suggests use of chemicals to counteract it) and therefore allows them to consider whether such condition could have been remedied or prevented without reference to ventilation. It fails to even use the word "ventilation" after its first reference to removal "by ventilation or in some manner," but, on the contrary, implies that defendant's duty was "to have remedied said condition" to make the place reasonably safe as a place of work (perhaps requiring the men to wear gas masks when the trucks were taken out); and that defendant is liable if "it was reasonably practicable for defendant to have prevented the accumulation of gas in such quantities." This could have been done by re-

quiring the trucks to be pushed in and out of the garage by the men instead of running the motors and while plaintiff does charge unnecessary operation of motors in the garage he undoubtedly would not contend it was improper to run motors in the garage at all. However, the jury could not be expected to be familiar with proper methods of conducting garage work. Furthermore, it ignores defendant's contention, supported by substantial evidence, that when all the doors were open there would be sufficient ventilation and does not require the jury to pass upon that question. Likewise, it ignores the evidence that defendant did have a power fan ventilating system and apparently assumes without any evidence that even if it did it was insufficient.

■ However, aside from its generalities, broadening of the issues and ignoring of defendant's evidence and contentions, the instruction is fundamentally wrong because it misconceives the basis of the employer's duty in such cases. This duty, hereinabove referred to in ruling the demurrer, is only to provide places of work, methods of doing work, and instrumentalities and appliances for doing work which are reasonably free from danger, and is not to provide the safest, newest, and best equipment, places and methods which have been or might be devised. This is true even under the absolute duty to provide safe equipment imposed by the Federal Boiler Inspection Act. [B. & O. Ry. Co. v. Groeger, 266 U. S. 521, 45 Sup. Ct. 169, 69 L. Ed. 419.] If the employer's duty was greater than that, he would be held, not to ordinary care, but to the highest degree of care, if not made an insurer. The test is what is found to be reasonably safe by usage and is commonly and ordinarily used in other similar places, occupations and businesses. The jury were given no such test by this instruction but were left to set up their own standard. The jury should not be "permitted to guess and decide, against the practice of the industry and knowledge of the art, what is a proper or improper ventilating system in the industry." [Pennsylvania Pulverizing Co. v. Butler, 61 Fed. (2d) 311, and cases cited.] Nor should they be permitted to so guess and decide without being given, as a guide, this rule and test, when the plaintiff is claiming that the failure to use some kind of mechanical ventilation was negligence. The evidence here was that there was a suction fan for ventilation in operation all the time plaintiff was employed up to 1923. Plaintiff disputed this, but it made a jury issue. If defendant had such a fan in operation, even the evidence of plaintiff's chemical expert would certainly be insufficient to show negligence in providing ventilation. At most it would only show that there were newer and more efficient means of suction ventilation. There was also, at least, a contested issue as to whether sufficient ventilation could be had by means of open doors or windows or whether some artificial means of creating a draft or suction was required. Natural means

might have been sufficient in May when, according to defendant's evidence, plaintiff first fainted in the garage, while in the winter artificial means might be necessary when it was too cold to open doors. Even in a case under the occupational disease statute, Plank v. Brown Petroleum Co., 332 Mo. 1150, 61 S. W. (2d) 328, where a higher degree of care than ordinary care is required that was the situation. The jury were allowed by this instruction to assume, without applying the test of ordinary, general or customary usage, that ordinary care under all circumstances required something more than natural ventilation. In fact, they were authorized to believe that it required any kind of complicated mechanical device they had ever heard of or could imagine. They might, for example, believe that ordinary care required, not one suction fan, but two, or twelve.

Plaintiff argues that the evidence shows that natural means were insufficient, but we hold that it was, at least, a jury question and that there was no substantial evidence to show that the fan system, defendant claimed to have, was insufficient. In other words, if there was such a fan system in operation at the time, the defendant could not be found guilty of negligence in providing ventilation under this evidence. Even if, as plaintiff also contends, the words "in some manner" only refer to other means of ventilation than natural ventilation, the instruction would still be erroneous because, as pointed out, it leaves the jury without any guide to determine the issue of what means of ventilation the defendant was required to furnish. It would still leave them to find that "to have remedied said condition," defendant would be required to furnish at least the best kind of ventilating machinery described in the testimony to "have prevented the accumulation of such gas" in injurious quantities, even though there was no evidence that any garage ever used such equipment prior to 1923. It would still be misleading to the jury by seeming to place a duty upon defendant, not merely to use ordinarily sufficient means of ventilation (such as was generally and customarily used), but to provide whatever machinery the jury might think necessary to remedy and prevent the condition. That would practically amount to requiring defendant to make plaintiff's place of work absolutely (not reasonably) safe, and thus insure plaintiff's safety from such gas.

Since this case must be retried it is necessary to consider the apparently unduly emphasized issue concerning the release and the instructions submitting that issue to the jury. As stated by the trial court in its memorandum overruling the motion for new trial: "Counsel for defendant, however, as well as counsel for plaintiff, in the pleadings and also in the evidence, treated the release as a very important issue in the case; and the manner of finding it in the files, its subsequent mutilation and reconstruction, occupy a large portion of the record in the case. Eminent counsel representing the respec-

tive parties, in their zeal and ardor in behalf of their clients, resorted to frequent insinuations and contradictions. Eight lawyers interested in the case, four stenographers, two office boys and a telephone operator testified respecting the release phase of the case. . . . The main issue in the case had become secondary to this controversy.''

The facts shown about this release were that in 1925 plaintiff sustained severe electric burns upon the fingers of his right hand which incapacitated him for work for a little over two weeks, and which were treated by defendant's surgeon: A few days before plaintiff returned to work, he went to the office of defendant's claim agent to settle for his hand injury, after a recommendation by his foreman that he be paid his regular wages for the time he was unable to work because of it. The foreman testified that the injury to his hand was all the settlement was to be for and that was all he was claiming. The claim agent said that he told him it covered that accident and all claims he had against the company up to date, but said he did not have in mind any other claim and did not know of any other claim then. The language of the release was:

''In consideration of being paid by the Union Electric Light and Power Company at the rate of full time from August 5, 1925, until such time as I am able, in the opinion of the Company's physician, to return to work and also for the further consideration of medical attendance furnished me by said Company until I am able to go back to work as aforesaid, I hereby release and forever discharge said Union Electric Light and Power Company, its successors and assigns, from any and all claims and causes of action whatsoever in law or equity, which I ever had or may have arising from any cause whatsoever to the date hereof and especially on account of an accident suffered by me at said Company's garage 20th and Locust Streets on August 5, 1925.''

It also states that the consideration is accepted ''for the purpose of making a full and final compromise, release, adjustment and settlement in full satisfaction of all demands for all injuries and damages above mentioned.'' Plaintiff testified that he signed it before reading it, but then read it over, noticed its general language, rolled it up, threw it into the wastebasket, and said it was no good. Plaintiff admitted he received checks for his full time but did not remember getting them from the claim agent. The claim agent denied that plaintiff threw the release into the wastebasket but said that plaintiff handed it to him and he gave plaintiff the checks, for the time he had lost, at that time. Defendant contends that plaintiff ratified the release by cashing the checks and obtained instructions upon this theory of ratification and complains that plaintiff's instructions are erroneous because they overlooked the issue of ratification and therefore conflict with instructions of defendant. We hold that there was, under the evidence, no issue of ratification to submit to

the jury. The uncontradicted evidence is that both parties were settling for the hand injury; that plaintiff was paid only for the time he lost because of the hand injury and received medical treatment only for the hand injury. Under plaintiff's evidence there was no delivery of the release and, if the jury believed it, there was no valid release. [23 R. C. L. 377, sec. 6.] If plaintiff intended to settle for his hand injury for full pay for lost time, he had a right to take the money for that. Taking the money for that would not be a release of another cause of action neither party contemplated or knew existed. The receipt of money is not a ratification of a release of a cause of action unless it is paid and received in satisfaction thereof. [23 R. C. L. 390, sec. 19.] Plaintiff's evidence "tended to show that as to the alleged contract of release there had never been a meeting of minds, consequently it was void, never in fact existed." Therefore, keeping the money for the hand injury would give it no validity. [Rau v. Robertson (Mo.), 260 S. W. 751; McCoy v. McMahon Construction Co. (Mo.), 216 S. W. 770.] Regardless of the general language of the release, defendant's own evidence tends strongly to show that the only meeting of the minds of the parties was upon the particular transaction specified therein and that the construction, which the parties themselves placed upon it, was that it applied only to that transaction. It has also been held that:

"Where the consideration received for a release is intended as compensation for the injuries sustained, and it subsequently develops that a substantial injury existed which was not known to the parties when the settlement was made and consequently was not taken into account in making it, the release may be avoided on the ground of mutual mistake." [Richardson v. C., M. & St. P. Railroad Co. (Minn.), 196 N. W. 643; O'Meara v. Haiden (Cal.), 268 Pac. 334, 60 A. L. R. 1381.]

At any rate, we hold that the question here is release or no release. If there was no release, there can be no issue of ratification because there is nothing to ratify. If there was a release then there might be a question raised as to what it intended to release and, if so, the question of whether the amount received by plaintiff was received for anything except the hand injury would be, at least, a jury question. If it was full valid release then it is good without ratification. There is, therefore, no issue of ratification in this case. This, however, does not mean that we approve plaintiff's Instruction No. 5, upon the issue of delivery. It improperly states the law and the facts argumentatively. Upon another trial it should be redrawn so as to state to the jury only the facts which it is necessary for them to find in order to warrant a finding that there was no delivery of the release.

Defendant makes a number of other assignments in regard to refusal of instructions which it requested and concerning the ad-

mission of testimony. Plaintiff contends that some of the latter are not properly preserved. Some of them are eliminated in the reply brief. Since the matters will probably not come up again the same way upon a retrial we do not deem it necessary to pass upon them here.

The judgment is reversed and the cause remanded. *Ferguson, C.,* concurs; *Sturgis, C.,* concurs in result.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.